MONTGOMERY V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-400-CR

FRANK ALLEN MONTGOMERY, JR. APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

Appellant Frank Allen Montgomery, Jr. appeals his conviction and life sentence for capital murder.  In ten points, appellant complains that the trial court erred by (1) allowing the State’s improper commitment questions during voir dire, (2) denying his 
Batson 
challenge, (3) and (4) admitting prejudicial photographs and prejudicial and extraneous evidence from a prior burn the victim received, (5) allowing a witness who lacked personal knowledge to testify, (6) overruling his motion for mistrial, (7) allowing an expert witness to testify as to a legal conclusion, (8) denying his motion for instructed verdict, (9) denying his jury charge instructions on criminally negligent homicide and manslaughter, and (10) allowing the State to make an improper jury argument during closing arguments.  We affirm.

II.  Background Facts

This case involves the death of S.K., a sixteen-month-old child.  S.K.’s parents were Robert K. and Roxane L.
(footnote: 1)  In November 2001, Roxane, a student at Tarrant County College, met appellant, a student at Texas Christian University, while she was working as a cashier at a Ross store.  In December 2001, Roxane moved in with appellant, leaving S.K. with Robert.
(footnote: 2)  In March 2002, Roxane took S.K. to live with her at appellant’s apartment, and Roxane and Robert shared custody of S.K.

On July 1, 2002, at approximately 2:20 p.m., Roxane went home after she received a phone call from appellant while she was at work saying that S.K. was hurt.
(footnote: 3)  When she arrived home, Roxane saw that appellant was holding S.K. over his shoulder and that he was talking on the phone.  When Roxane went over to S.K. and looked at her, she noticed that S.K. had a “big burn” on her back.  Roxane then called S.K.’s pediatrician, Dr. Walter Halpenny, to determine if she should take S.K. to the hospital, and Dr. Halpenny told Roxane to bring S.K. to his office.  Roxane arrived at Dr. Halpenny’s office at approximately 3:00 p.m.  After examining S.K., Dr. Halpenny prescribed some ointment for the burn, but he did not call Child Protective Services.

On July 2, 2002, Roxane stayed at home with S.K. because of the burn.
(footnote: 4)  Roxane testified that they lay in bed all day, that S.K. acted normally, and that she drank milk and ate Vienna sausages.  Appellant was at class during the day.  When he arrived home that afternoon, Roxane left S.K. with appellant at approximately 4:00 p.m. to study for a test she had at 6:00 p.m that night.  At approximately 6:50 p.m., appellant called 911 because S.K. had stopped breathing.  Roxane arrived home when the paramedics were at the apartment.  An ambulance then took S.K. to Cook Children’s Medical Center.  When S.K. arrived at the hospital, she did not have a heartbeat or pulse, and Dr. Michael Cowan, a doctor in pediatric emergency medicine, told Roxane that he did not expect S.K. to survive.  However, after administering epinephrine, Dr. Cowan was able to get a pulse.  At approximately 9:30 p.m. that night, S.K. was admitted to the intensive care unit (ICU).  While S.K. was in the ICU, doctors performed neurological tests on her brain to see if there was any brain activity.  Despite all the medical care, S.K. was pronounced dead the next day, on July 3, 2002, at 1:45 p.m.

On August 27, 2004, a jury found appellant guilty of capital murder, and the trial court assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.
(footnote: 5)
III.  Commitment Questions

In his first point, appellant contends that the trial court abused its discretion by overruling his objection to four questions asked by the State during voir dire examination.

A.  Standard of Review

The trial court has broad discretion over the process of selecting a jury. 
 Ewing v. State
, 157 S.W.3d 863, 866 (Tex. App.སྭFort Worth 2005, no pet.); 
see Barajas v. State
, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  Appellate courts should not disturb a trial court’s ruling on the propriety of a particular question during voir dire absent an abuse of discretion.  
Barajas
, 93 S.W.3d at 38;
 Lydia v. State
, 117 S.W.3d 902, 904 (Tex. App.སྭFort Worth 2003, pet. ref’d).

B.  Applicable Law

In 
Standefer
, the court of criminal appeals held that during voir dire a trial court should first determine if a question is a commitment question.
  Standefer v. State
, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001); 
accord Lydia
, 117 S.W.3d at 905.  If it is a commitment question, the next inquiry is whether the question was nevertheless a proper question.  
Standefer
, 59 S.W.3d at 181-82.  A commitment question is proper if one of the possible answers to that question gives rise to a valid challenge for cause. 
 Id. 
at 182; 
Ewing
, 157 S.W.3d at 866.  However, even if a question meets the “challenge for cause” requirement, the inquiry does not end there.  
Lydia
, 117 S.W.3d at 905.  A proper commitment question must also contain only those facts necessary to test whether a prospective juror may be challengeable for cause.  
Id.
; 
see Standefer
, 59 S.W.3d at 182.

C.  Analysis

Appellant points to four questions asked by the prosecutor as commitment questions.  We will address each question in order.  The first question that appellant contends is a commitment question is, “What are some circumstances that would assist you maybe in determining whether [the death] was knowing?”  To preserve error regarding improper voir dire questions, a party must make a timely, specific objection at the earliest possible opportunity.
  Ross v. State
, 154 S.W.3d 804, 807 (Tex. App.སྭHouston [14th Dist.] 2004, pet. ref’d); 
accord Turner v. State
, 805 S.W.2d 423, 431 (Tex. Crim. App.), 
cert. denied
, 502 U.S. 870 (1991).  Appellant did not object to this particular question until after a veniremember had answered the question.  Thus, appellant did not object at the earliest possible opportunity and has not preserved his complaint regarding this questions.  
See Halprin v. State, 
170 S.W.3d 111, 119 (Tex. Crim. App. 2005); 
Ross
, 154 S.W.3d at 807. 

The second question that appellant contends is a commitment question is, “Let me ask you this then.  See if anybody agrees with me.  Maybe where the location of the injury is.  Okay?  Well, was somebody hit in the foot?  Okay?  Or was somebody struck someplace else, maybe the head, maybe an internal organ?”  Appellant sought a running objection to this line of questioning.  The trial court granted the running objection but denied appellant’s objection to this particular question. 

Before asking this question, the prosecution had defined the term “knowingly” to the veniremembers and then asked the veniremembers what evidence they would be looking at to determine if appellant acted knowingly.  Assuming that appellant’s objection was sufficient to alert the trial court to a claim that the prosecutor’s question was an improper commitment question, we hold that the prosecutor’s question was not an improper commitment question.  
See Halprin
, 170 S.W.3d at 120.  The question did not attempt to bind the veniremembers to resolve or refrain from resolving an issue (i.e., appellant’s mental state) on the basis of one or more facts in the questions.  
See id.
; 
Standefer
, 59 S.W.3d at 180.  

The third question that appellant complains about is, “Mr. Holtman, somebody takes a four-year-old child, throws him off the balcony of a five-story building, and the child hits asphalt, I mean let’s say concrete.  What’s reasonably likely — reasonably certain to occur?”  Appellant objected to this question, and the trial court sustained the objection.  Appellant did not request any additional relief from the trial court regarding this question.  Thus, appellant obtained all the relief he requested when the trial court granted his objection.  
See Turner
, 805 S.W.2d at 432.

The final question that appellant argues is a commitment question is, “Let me ask it this way.  I’ll ask it a little bit different.  With respect to determining whether or not something is reasonably certain to have occurred, okay, if somebody throws a child off a five-story balcony, all right, and onto the asphalt, what’s reasonably certain to occur with regard to the child?”  The State argues that this question is a permissible hypothetical question.  It is proper to use hypothetical fact situations to explain the application of the law.  
See Cuevas v. State
, 742 S.W.2d 331, 353 (Tex. Crim. App. 1987),
 cert. denied
, 500 U.S. 929 (1991), 
overruled on other grounds, Hughes v. State, 
878 S.W.2d 142 (Tex. Crim. App. 1992).  However, questions may not be asked to commit veniremembers to a position based on a set of circumstances analogous to the case in question.  
Rivera v. State
, 82 S.W.3d 64, 66 (Tex. App.སྭSan Antonio 2002, pet. ref’d); 
see Atkins v. State
, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997); 
Cuevas
, 742 S.W.2d at 353.  

Here, the prosecutor was using hypothetical questions to explain to the jury the concept of reasonable certainty.  Directly after this question, the prosecutor asked another veniremember, “I believeསྭ say a two-year-old that can’t swim and you leave the two-year-old right there seated on the edge of the pool and you go inside and you’re gone for about an hour.  What do you think is reasonably certain to occur?  And that child can’t swim?”  We determine that the prosecutor was explaining the law by asking the veniremembers what would be reasonably certain to occur in a given situation rather than asking the veniremembers to commit to a position based on analogous circumstances.

Having determined that appellant did not properly preserve error as to the first question, that questions two and four were not commitment questions, and that appellant received all the relief that he requested as to question three, we hold that the trial court did not abuse its discretion in its ruling on these four questions.  Therefore, we overrule appellant’s first point.

IV.  
Batson 
Challenge

In appellant’s second point, he complains that the trial court erred by denying his 
Batson 
challenge in regard to four veniremembers.  
See Batson v. Kentucky
, 476 U.S. 79, 106 S. Ct. 1712 (1986).  

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection.  
Jasper v. State
, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).  When reviewing a trial court’s finding with regard to a 
Batson 
challenge, an appellate court reverses the ruling only if it appears clearly erroneous.  
Stewart v. State
, 176 S.W.3d 856, 858 (Tex. App.སྭHouston [1st Dist.] 2005, no pet.); 
see Rhoades v. State
, 934 S.W.2d 113, 123 (Tex. Crim. App. 1996).  Because a trial court is in a unique position to make such a determination, the judge’s decision is accorded great deference.  
Jasper
, 61 S.W.3d at 421; 
Ladd v. State
, 3 S.W.3d 547, 563 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1070 (2000).  

Once a party raises a 
Batson 
challenge, the trial court must engage in a three-step inquiry.  First, the defendant must make a prima facie showing of racial discrimination and thus carries a burden of production.  
Peetz v. State
, 180 S.W.3d 755, 758 (Tex. App.སྭHouston [14th Dist.] 2005, no pet.); 
see Ford v. State
, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).  Second, the burden of production shifts to the State to present a racially neutral explanation for its challenged strike.
  Stewart
, 176 S.W.3d at 858.  Finally, the trial judge rules on whether the neutral reasons given for the peremptory challenge were contrived to conceal racially discriminatory intent. 
 Jasper
, 61 S.W.3d at 421; 
Stewart
, 176 S.W.3d at 858. 

Here, appellant argues that the State used its peremptory challenges to remove all potential African-American veniremembers from the panel.  During the voir dire conference, the prosecutor explained that he used a peremptory strike on Sabrena Perkins, veniremember three, because she indicated that rehabilitation would be her number one priority.  Additionally, the prosecutor stated that he struck 
all 
veniremembers who expressed that their main goal was rehabilitation, including two veniremembers who were Caucasian and two who were Hispanic.  A veniremember’s belief in rehabilitation as the primary goal of punishment is a race-neutral reason for the exercise of a peremptory challenge.  
Victor v. State
, 995 S.W.2d 216, 222 (Tex. App.སྭHouston [14th Dist.] 1999, pet. ref’d); 
see Adanandus v. State
, 866 S.W.2d 210, 225 (Tex. Crim. App. 1993),
 cert. denied
, 510 U.S. 1215 (1994).  We conclude that the prosecutor’s explanation for exercising a peremptory challenge against veniremember three was race neutral.

Additionally, the State explained that it used peremptory strikes on Deborah Sims, veniremember eighteen, and Valerie Sample, veniremember thirty, because both Sims and Sample stated that they had family members who had been, or still were, in prison.  Sims stated that her husband had been in prison twice for robbery and drugs and that he had only been out of prison for approximately one year.
(footnote: 6)  Sample said that her grandson had been convicted for murder and that she did not think she could set aside her personal situation and base the verdict solely on what was heard during appellant’s trial.  Texas courts have held that strikes of a prospective juror on the basis that he or she has a family member or close friend who had been arrested, charged, or convicted of a crime are race neutral.  
Alexander v. State, 
919 S.W.2d 756, 765 (Tex. App.སྭTexarkana 1996, no pet.); 
see Murray v. State
, 861 S.W.2d 47, 52 (Tex. App.སྭTexarkana 1993, pet. ref’d); 
Garcia v. State
, 833 S.W.2d 564, 567 (Tex. App.སྭDallas 1992), 
aff'd on other grounds
, 868 S.W.2d 337 (Tex. Crim. App. 1993).  We hold that the prosecutor provided a racially-neutral reason for exercising peremptory strikes against veniremembers eighteen and thirty.

In regard to veniremember thirty-six, appellant did not preserve error for review on appeal.  To preserve error for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection.  
Wilson v. State
, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).  Here, appellant did not object or obtain a ruling on this 
Batson 
challenge; therefore, he did not properly preserve error.  Having determined that the State provided racially-neutral reasons for exercising peremptory strikes against veniremembers three, eighteen, and thirty, and that appellant failed to properly preserve error in regard to veniremember thirty-six, we overrule appellant’s second point.

V.  Photographs

In his third point, appellant complains that the trial court abused its discretion in admitting State’s exhibits twenty-three through twenty-seven into evidence because the prejudicial effect of the photographs substantially outweighed their probative value.

The admissibility of photographs over a challenge is within the sound discretion of the trial court.  
Moreno Denoso v. State
, 156 S.W.3d 166, 177 (Tex. App.སྭCorpus Christi 2005, pet. ref’d); 
see Rojas v. State
, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); 
Montgomery v. State
, 810 S.W.2d 372, 378-80 (Tex. Crim. App. 1990).  The trial court’s decision will be reversed only if it was “outside the zone of reasonable disagreement.”  
Moreno Denoso
, 156 S.W.3d at 177.

Under rule 403, a trial court may exclude relevant evidence “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.”  
Tex. R. Evid.
 403; 
Petruccelli v. State
, 174 S.W.3d 761, 765 (Tex. App.སྭWaco 2005, pet. ref’d).  We generally consider the following factors in any prejudice-versus-probative value analysis:  (1) how probative is the evidence, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, (3) the time the proponent needs to develop the evidence, and (4) the proponent’s need for the evidence.  
Solomon v. State, 
49 S.W.3d 356, 366 (Tex. Crim. App. 2001).  

A court may consider the following factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice:  (1) the number of exhibits offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are offered in color or in black and white, (6) whether they are close-up, and (7) whether the body depicted is clothed or naked.  
Sosa v. State
, Nos. 14-03-01116-CR, 14-03-01117-CR, 14-03-01118-CR, 2005 WL 171352, at *3 (Tex. App.སྭHouston [14th Dist.] Jan. 27, 2005, pet. ref’d); 
see Rojas
, 986 S.W.2d at 249.  Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself.  
Frank v. State
, 183 S.W.3d 63, 77 (Tex. App.སྭFort Worth 2005, pet. filed); 
see Rojas
, 986 S.W.2d at 249.  Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect.  
Frank
, 183 S.W.3d at 78; 
see Legate v. State
, 52 S.W.3d 797, 807 (Tex. App.སྭSan Antonio 2001, pet. ref’d).

The photographs were introduced during the testimony of Dr. Marc Andrew Krouse, the deputy chief medical examiner for Tarrant County.  State’s exhibits twenty-one and twenty-two are external autopsy photographs depicting a bruise behind S.K.’s ear and a bruise on her forehead.  The photographs are approximately eight and a half by ten and three-fourths inches in size, are moderately close-up, were offered in color, and are not gruesome.  State’s exhibits twenty-three through twenty-seven are autopsy photographs showing bleeding under S.K.’s scalp
(footnote: 7) and on her brain.  The photographs are in color and show the exposed brain and scalp from different angles.  The admitted photographs are gruesome and show a considerable amount of blood on the brain.  However, the photographs depict the wounds S.K. suffered and are no more gruesome than the facts of the offense itself.  
See Sosa
, 2005 WL 171352, at *3;
 see also Sonnier v. State
, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).  

Appellant argues that the photographs did not clearly demonstrate the facts to which Dr. Krouse was testifying.  Dr. Krouse testified that the manner of S.K.’s death was homicide and that the cause of death was blunt force trauma to the head.  He further testified about her injuries and the blood found on S.K.’s brain, which is typically not supposed to be there.  We conclude that the photographs did illustrate Dr. Krouse’s testimony.  We hold that the probative value of the photographs was not substantially outweighed by their prejudicial effect.  
See 
Tex. R. Evid.
 403.  Thus, we determine that the trial court did not abuse its discretion by admitting State’s exhibits twenty-one through twenty-seven.  
Frank
, 183 S.W.3d at 78.  Therefore, we overrule appellant’s third point.

VI.  Extraneous Offense

In his fourth point, appellant contends that the trial court abused its discretion by denying his motion to exclude extraneous evidence of a burn that S.K. received on her back the day before her death.  Specifically, appellant argues that the probative value of evidence of the burn was substantially outweighed by the danger of unfair prejudice.

A.  Applicable Law

Article 38.36 of the code of criminal procedure specifies what evidence can be used in murder trials.  
Tex. Code Crim. Proc. Ann.
 art. 38.36 (Vernon 2005).  The relevant section of article 38.36 provides,

In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense. 

Id. 
§ 38.36(a).  Evidence admitted under article 38.36 is subject to rules of evidence 403 and 404(b).  
See Smith v. State
, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999).  

Rule 403 states, “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.”
  Tex. R. Evid.
 403. Rule 404(b) provides,

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State’s case-in-chief such evidence other than that arising in the same transaction.  

Tex. R. Evid.
 404(b).

B.  Standard of Review

The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion.  
Moses v. State
, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); 
Soto v. State
, 156 S.W.3d 131, 134 (Tex. App.སྭFort Worth 2005, pet. ref’d). That is to say, as long as the trial court’s ruling was within the zone of reasonable disagreement, the appellate court should affirm. 
 Moses, 
105 S.W.3d at 627; 
Montgomery
, 810 S.W.2d at 387-88 (op. on reh’g); 
Karnes v. State
, 127 S.W.3d 184, 189 (Tex. App.སྭFort Worth 2003, no pet.).  In situations such as this, we will affirm the decision of the trial court if there is any valid ground upon which the decision could have been made. 
Soto
, 156 S.W.3d at 134; 
accord State v. Ross
, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000).  To constitute an extraneous offense, the evidence must show that a crime or bad act was committed and that the defendant was connected to it.  
Moreno v. State, 
858 S.W.2d 453, 463 (Tex. Crim. App. 1993), 
cert. denied
, 510 U.S. 966 (1993).

Rule 404(b) prohibits the admission of evidence of “other crimes, wrongs, or acts” in a criminal case to prove that the defendant acted in conformity with his character to commit crimes.  
Tex. R. Evid.
 404(b); 
Marc v. State
, 166 S.W.3d 767, 775 (Tex. App.སྭFort Worth 2005, pet. ref’d).  Such evidence of extraneous offenses may be admitted for other purposes, however, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  
See Moses
, 105 S.W.3d at 626.  The circumstances listed in rule 404(b) of when character evidence may be used are illustrative, not exhaustive.  
Montgomery
, 810 S.W.2d at 387.

C.  Analysis

The State offered the evidence of the burn for the purposes of showing appellant’s state of mind and the relationship between appellant and S.K.  At a hearing outside the presence of the jury, appellant objected to the evidence on rule 403 grounds, and the trial court overruled appellant’s objection.  However, the trial court gave the jury a limiting instruction on the burn evidence:

Ladies and gentlemen, I need to give you a specific instruction.  Earlier this morning when Dr. Halpenny testified, he testified as to an event that may have occurred on a day prior to the date of this alleged offense.  I want to instruct you that [appellant] is on trial solely for the charges contained in the indictment.  There may have been other acts introduced into evidence and with regard to those acts, you [are] instructed that that was admitted only for the purpose of showing the state of mind of [appellant] and the child, and the previous and subsequent relationship between [appellant] and the child, if it does, for you.  Okay.

Now, before you consider any other act not alleged in the indictment, you must believe beyond a reasonable doubt that [appellant] committed those acts, if they were committed, and then you may only consider them for the purposes that I told you before, the state of mind of [appellant] and the child, and the previous and subsequent relationship between [appellant] and the child.

The State argues that the burn evidence was admissible under article 38.36 because in appellant’s written statements, he stated that any injury that he inflicted on S.K. the night of her fatal injury was accidental.  We agree.  The day before her fatal injuries, S.K. was in appellant’s sole care when she received a large second degree burn on her back.  Several doctors testified that the burn was suspicious because of its location (i.e., the middle part of her back).  We conclude that the burn evidence is relevant under article 38.36 to show appellant’s state of mind and his relationship with S.K. and does rebut his claim of the accidental nature of the injury that resulted in her death.

Appellant relies on 
Cain v. State 
to support his argument. 642 S.W.2d 806 (Tex. Crim. App. 1982).  However, 
Cain 
is distinguishable from the present case.  In 
Cain
, the court of criminal appeals determined that the trial court erred by admitting evidence of the extraneous offenses of rape and sodomy against the victim.  
Id.
 at 808.  The court determined that the two extraneous offenses were not relevant to the defendant’s case because there was no evidence that connected appellant with the offenses.  
Id. 
 Here, however, appellant admitted in his written statement that he was with S.K. when she received the burn.  We believe that the State has shown that appellant was connected with the burn that S.K. received. 
 See id.
 at 809.  

Because the thrust of appellant’s complaint is that the evidence is substantially more prejudicial than probative under rule 403, we must also determine whether the trial court abused its discretion by admitting the evidence over appellant’s rule 403 objection.  
See 
Tex. R. Evid.
 403.  The burn was important to explain the nature of the relationship between appellant and S.K. because appellant disputed that he inflicted S.K.’s injuries and that even if he did so, he did not do so knowingly.  Although several witnesses testified about the burn, it took minimal time to develop the evidence.  The burn is mentioned in only thirty-three pages out of about several hundred in the record. The testimony and photograph of the burn was not so graphic that it would have impressed the jury in an irrational, yet indelible way, and it was not as disturbing as the testimony about the injuries that caused S.K.’s death.  Finally, the State has a compelling need for the evidence because its case was entirely circumstantial, and appellant contested both his identity as the perpetrator and his state of mind.  Thus, after balancing the rule 403 factors, we conclude and hold that the trial court did not abuse its discretion by overruling appellant’s objection to the burn evidence.  

Having determined that the burn evidence was relevant, admissible, and not substantially more prejudicial than probative, we hold that the trial court did not abuse its discretion by admitting the evidence.  Thus, we overrule appellant’s fourth point.  

VII.  Admission of Evidence

In point five, appellant asserts that the trial court abused its discretion by overruling his objection to the testimony of Commander Dean Simonds, a police officer with the Benbrook Police Department, regarding S.K.’s height because it was not based on his personal knowledge.

A.  Applicable Law

Rule of evidence 602 governs when a witness can testify.  
Tex. R. Evid.
 602.  Rule 602 provides, “A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness.”  
Id. 
 

B.  Analysis

Appellant argues that the State failed to prove that Commander Simonds had personal knowledge about S.K.’s height; therefore, the trial court erred in admitting the evidence.  At trial, Commander Simonds testified that he did not obtain S.K.’s height during his investigation.  However, Commander Simonds stated that he incorporated the autopsy report into the police report and that the autopsy report stated that S.K.’s height was twenty-nine and one-half inches.  Appellant objected on the basis that Commander Simonds did not have personal knowledge of S.K.’s height, and the trial court overruled the objection.

To preserve error, a party must continue to object each time the objectionable evidence is offered.  
Fuentes v. State
, 991 S.W.2d 267, 273 (Tex. Crim. App.), 
cert. denied,
 528 U.S. 1026 (1999); 
Ethington v. State
, 819 S.W.2d 854, 858-59 (Tex. Crim. App. 1991).  A trial court’s erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling.  
Leday v. State
, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); 
Johnson
 
v. State
, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), 
cert. denied
, 501 U.S. 1259 (1991),
 overruled on other grounds by Heitman v. State
, 815 S.W.2d 681 (Tex. Crim. App. 1991).  This rule applies whether the other evidence was introduced by the defendant or the State.  
Leday
, 983 S.W.2d at 718.

Here, Dr. Krouse testified immediately after Commander Simonds.  Dr. Krouse stated that at the time of her autopsy, S.K. was twenty-nine and one-half inches tall.  Appellant did not object to this testimony.  Because appellant did not object to Dr. Krouse’s testimony, we hold that he did not preserve error.  Further, the evidence is of an objective nature.  Its accuracy was readily verifiable and controvertible, but appellant never offered controverting testimony.  Even if he had, we cannot see how the admission of the evidence could have prejudiced or harmed appellant.  Therefore, we overrule appellant’s fifth point.

VIII.  Testimony of Polygraph Examination

In point six, appellant argues that the trial court abused its discretion in denying his motion for mistrial when a State’s witness mentioned polygraph testing during his testimony.

A.  Applicable Facts

During the State’s redirect examination of Michael Holden, a civilian employee who occasionally works with the Benbrook Police Department, the prosecutor asked Mr. Holden whether he typically videotapes his interviews:

[State]:  Mr. Holden, you were asked some questions with regard to the videotape capability in your office; is that correct?

[Holden]:  Yes, ma’am.

[State]:  Can you explain to the jury whether or notསྭ whether it’s the rule or the exception for you to videotape an interview?

[Holden]:  Depending upon the case, it wouldསྭ it would depend on whether it was the rule or the exceptionསྭ [an] example I would give all ladies that come in to 
take a polygraph
, they’re all videotaped for reasons to protect.  [Emphasis added.]

The defense attorney then asked for a bench conference, and the jury was removed from the courtroom.  During the conference, the trial judge stated that he believed that Mr. Holden’s comment about the polygraph was “totally inadvertent,” and the defense attorney agreed.  Appellant then asked for a mistrial on the basis that Mr. Holden’s testimony was a violation of the motion in limine, and the trial court denied the motion.  When the jury returned to the courtroom, the trial judge gave the following instruction, “Ladies and gentlemen, in the last answer of the witness, Mr. Holden was discussing sometimes in his line of work ladies come in to take polygraphs.  That’s not applicable in this case and you are to totally disregard it in considering his testimony.”

B.  Analysis

A trial court may not admit polygraph examination evidence or consider it for any purpose.  
Wright v. State
, 154 S.W.3d 235, 238 (Tex. App.སྭTexarkana 2005, pet. ref’d).  The court of criminal appeals has held that when a witness gives an unresponsive answer that mentions a polygraph test, but does not mention the results of the test, there is no error in failing to grant a mistrial when the objection has been sustained and the jury instructed to disregard.  
Peoples v. State
, 928 S.W.2d 112, 116 (Tex. App.སྭHouston [1st Dist.] 1996, pet. ref’d); 
see, e.g., Richardson v. State
, 624 S.W.2d 912, 914-15 (Tex. Crim. App. 1981);
 Reed v. State
, 522 S.W.2d 466, 468 (Tex. Crim. App. 1975).

Here, Mr. Holden did not testify that 
any
 polygraph examination was given to appellant, much less to the results of a polygraph examination. Additionally, there is no indication that the prosecutor elicited the information from Mr. Holden, and defense counsel even agreed that it was completely inadvertent.  Moreover, the trial court instructed the jury to disregard the testimony regarding the polygraph examination when it denied appellant’s motion for mistrial.  Because Mr. Holden did not testify as to the existence of a polygraph examination taken by appellant and the trial court instructed the jury to disregard the evidence, we hold that the trial court did not abuse its discretion by denying appellant’s motion for mistrial.  Thus, we overrule appellant’s sixth point.

IX.  Expert Witness Testimony

In appellant’s seventh point, he contends that the trial court abused its discretion by overruling his rule of evidence 705 objection to a portion of the testimony of Dr. Cowan, a State’s expert.  Appellant claims that the question the State posed to Dr. Cowan would require him to give a legal conclusion.

A.  Standard of Review

The question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court’s discretion.
  Wyatt v. State
, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).  Absent a clear abuse of discretion, the trial court’s discretion to admit or exclude testimony will not be disturbed.  
Id.
; 
see Penry v. State
, 903 S.W.2d 715, 762 (Tex. Crim. App.), 
cert. denied
, 516 U.S. 977 (1995).  

B.  Applicable Law

Rule of evidence 702 governs the testimony of expert witnesses:  “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”  
Tex. R. Evid.
 702.  Additionally, rule 704 provides, “Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.”  
Tex. R. Evid.
 704.  Further, rule 705 discusses when an expert can disclose facts or data that he has based his opinion upon.  
Tex. R. Evid.
 705.  The pertinent part of rule 705 provides,

(a) 
Disclosure of Facts or Data
.  The expert may testify in terms of opinion or inference and give the expert’s reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise.  The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data.  

(b) 
Voir dire. 
 Prior to the expert giving the expert’s opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall, or in a civil case may, be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based.  This examination shall be conducted out of the hearing of the jury.

Tex. R. Evid.
 705(a), (b).  

C.  Applicable Facts

During the State’s direct examination of Dr. Cowan, a doctor in pediatric emergency medicine who was testifying about the degree of force necessary to cause S.K.’s injuries, the prosecutor asked him, “Now, if someone had either witnessed this particular act on S.K., this violent assault, or committed the assault themselves, would they know thatསྭ and when I say ‘know,’ what I [am] referring to, would they be reasonably certain to know that S.K. could die from this?”  Appellant then objected on the basis that the question called for a legal conclusion, it assumed facts that were not in evidence, and it asked for Dr. Cowan’s speculation on whether a person would be reasonably certain to know that S.K. would die from her injuries.  The State responded that Dr. Cowan was “qualified as an expert to testify in the area of injuries,” that he had been a pediatric emergency doctor for over ten years, and that he was qualified to give an opinion.  Appellant then asked for a rule 705 hearing outside the presence of the jury, and the trial court granted the hearing.  At the rule 705 hearing, the trial court overruled appellant’s objection, allowed Dr. Cowan to testify, and granted appellant a running objection.

D.  Analysis

The special knowledge that qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things.  
Penry
, 903 S.W.2d at 762; 
see Wyatt
, 23 S.W.3d at 27. 

At trial, Dr. Cowan testified that he is board certified by the American Board of Pediatrics in the areas of pediatrics, general pediatrics, and pediatric emergency medicine.  He is also a member of the Dallas County Medical Society and the Texas Medical Association.  Dr. Cowan testified that he has written and published several articles in the area of emergency medicine.  His most recent publication was a chapter in a textbook, 
Pediatric Emergency Care
, that discussed respiratory distress in pediatric patients.  He has also testified as an expert in criminal cases before.  Additionally, each year, Dr. Cowan is required to attend twenty-four hours of continuing medical education, of which fourteen hours must be completed in the area of trauma.  During the past ten years of practice, Dr. Cowan estimated that he had seen approximately 40,000 patients.  Dr. Cowan further testified that he reads peer-reviewed medical journals that discuss topics pertinent to the emergency room.

Additionally, Dr. Cowan was S.K.’s treating physician in the emergency room on July 2, 2002.  He testified that he reviewed her CAT scan and that her head injuries were severe.  Dr. Cowan stated that it took a significant amount of energy applied to S.K.’s brain to cause her injuries.  He further stated that S.K. would have been symptomatic within minutes of receiving the head injury. Dr. Cowan testified that S.K. would have been unconscious fairly quickly.

At a hearing, outside the presence of the jury, Dr. Cowan testified that  he based his opinion on his practice in emergency medicine and what he saw in the emergency room while treating S.K.  Dr. Cowan also stated that he based his opinion on the research he obtained after interviewing approximately twelve to thirty individuals over the past ten to twelve years who might have inflicted the same type of trauma that S.K. received on other children.  During the interviews, Dr. Cowan acknowledged that not all of the individuals admitted that they knew that death would be a result of their actions.  The trial court overruled appellant’s objection and held that Dr. Cowan was qualified to testify.  Appellant contends that Dr. Cowan was not qualified to testify on what someone believed would happen if they saw an assault.  We conclude, however, that the training, experience, research, seminars, and periodicals about which Dr. Cowan testified and upon which he based his medical opinion qualified him to testify as an expert witness.  
See Wyatt
, 23 S.W.3d at 27.  Because we hold that the trial court did not abuse its discretion by allowing Dr. Cowan to testify as an expert witness, we overrule appellant’s seventh point. 

X.  Motion for Instructed Verdict 

In appellant’s eighth point, he argues that the trial court erred by denying his motion for instructed verdict and that the evidence is factually insufficient to support the verdict.  Specifically, he argues that the evidence is legally and factually insufficient to prove that (1) appellant had the requisite mental state to commit the offense, and (2) appellant injured S.K. or  was with S.K. when she was injured.

A.  Standards of Review

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
McDuff v. State
, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); 
Franks v. State
, 90 S.W.3d 771, 789 (Tex. App.—Fort Worth 2002, no pet.).  In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Analysis

Appellant moved for an instructed verdict at the close of the State’s case-in-chief, and the trial court denied the motion.  In a review of a trial court’s denial of a motion for instructed verdict, our review of the evidence is not limited to the evidence presented before an appellant’s motion for instructed verdict is made at the end of the State’s case-in-chief.  
Smith v. State
, 109 S.W.3d 80, 81 (Tex. App.སྭTexarkana 2003, no pet.).  Although appellant acknowledges that evidence was presented that supports the verdict, he contends that the contrary evidence is strong enough that the beyond-a-reasonable-doubt standard could not have been met.

1.  Evidence that Appellant Injured S.K.
 

Appellant argues that the evidence is legally and factually insufficient to show that he was the individual who injured S.K. and that S.K. was in his care when she was injured.  Appellant cites to Dr. Krouse’s testimony as support for his contention that he was not with S.K. when she sustained the injuries.  Dr. Krouse testified that there were three areas of impact on S.K.’s head and that he was unable to determine which injury resulted in her death.  He also stated that S.K. had one small bruise on her right forehead that had a yellow color-change to it and estimated that it was approximately one and one-half days old.
(footnote: 8)  Dr. Krouse opined that S.K.’s injuries occurred twenty-four to thirty-six hours before her death.
(footnote: 9)  However, he testified that he could not pin S.K.’s injuries to that time frame definitively, but that it was the “most likely timeframe.”  Dr. Krouse stated that S.K. would have been symptomatic and unconscious immediately after sustaining the injuries.  He testified that he would expect S.K. to be unconscious within ten to fifteen minutes at the outer time frame.

However, Dr. Cowan estimated that S.K.’s injuries occurred between 6:00 and 6:30 p.m. on July 2, 2002, approximately nineteen hours before her death.  He based his opinion on the extent of S.K.’s head injury when she arrived at Cook Children’s Medical Center and his training and experience treating children in the emergency room.  Dr. Cowan testified that it was his opinion that her injuries could not have occurred at 4:00 or 5:00 p.m. that day.  He also stated that S.K. would have been symptomatic within minutes of receiving this type of injury and that she would have been unconscious fairly quickly.  Dr. Cowan opined that S.K. probably did not regain consciousness after the injuries. 

Additionally, defense expert Dr. Sridhar Natarajan, chief medical examiner of Lubbock County, agreed with Dr. Krouse’s testimony that the injuries could have occurred at the outer frame of twenty-four to thirty-six hours before S.K.’s death.  However, he testified that S.K.’s injuries
 could have
 occurred between 6:00 and 6:50 p.m. on July 2.  Further, Dr. Natarajan stated that the lethal head injuries must have been inflicted after S.K. ate because the severity of the injury would have prevented her from eating.
(footnote: 10)  Therefore, based on appellant’s written statements, S.K. could not have received her head injury before 6:00 p.m.  Dr. Natarajan said that once S.K. was injured, she would have had a behavioral change almost immediately after receiving this type of injury.

Appellant contends that the evidence does not establish that he inflicted the fatal injuries or that he was with S.K. when she received the injuries. However, in each of appellant’s written statements, he gave different versions as to what occurred on July 2 when he was taking care of S.K.  In his July 9, 2002 statement, appellant stated that S.K. was breathing funny and that he laid her down in a queen-size bed to sleep. After determining that something was wrong with her, appellant picked S.K. up and ran out of the bedroom.  Appellant was not sure if her head hit the door or the door frame as he was leaving the bedroom.  But in appellant’s July 12, 2002 written statement, he stated that he was certain that S.K.’s head hit the door or the door frame when he was running out of the bedroom.  In this statement, appellant also said that after S.K. threw up in her bed, he took her into the bathroom and gave her a bath in the sink.  When she was in the sink, appellant said S.K. began kicking and she flung her head back and hit the sink with a “thud.”  After bathing and feeding S.K., appellant put her back to sleep in her bed.  In yet another statement, appellant stated that he might have dropped S.K. while he was holding her.

The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony.  
Barcenes v. State
, 940 S.W.2d 739, 744 (Tex. App.—San Antonio 1997, pet. ref’d); 
see Sharp v. State
, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986), 
cert. denied
, 488 U.S. 872 (1988).  We hold that the evidence is not so contrary to the jury’s verdict that it requires reversal.  Appellant’s different versions of events is evidence of his consciousness of guilt, and the jury could have reasonably concluded that appellant changed his stories because he had something to hide.  
See Couchman v. State
, 3 S.W.3d 155, 164 (Tex. App.—Fort Worth 1999, pet. ref’d).  

2.  Mental State

With regard to mental state, appellant first contends that the evidence is legally and factually insufficient to prove that he had the requisite mental state to commit the offense.  To establish that appellant committed the offense of capital murder, the State was required to show that appellant “knowingly cause[d] the death” of S.K. who was under six years of age.  
See 
Tex. Penal Code Ann.
 §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(8) (Vernon Supp. 2005).  Proof of a culpable mental state almost invariably depends upon circumstantial evidence. 
 Lee v. State
, 21 S.W.3d 532, 539 (Tex. App.སྭTyler 2000, pet. ref’d);
 Morales v. State
, 828 S.W.2d 261, 263 (Tex. App.སྭAmarillo 1992), 
aff'd
, 853 S.W.2d 583 (Tex. Crim. App. 1993). Ordinarily, the culpable mental state must be inferred from the acts of the accused or the surrounding circumstances, which include not only acts, but words and conduct.  
Lee
, 21 S.W.3d at 539;
 Morales
, 828 S.W.2d at 263; 
see Ledesma v. State
, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).   

At trial, Dr. Krouse testified that S.K. died as a result of blunt force injury to her head.  He analogized S.K.’s injuries to those received when a child is unrestrained in a car that is traveling thirty miles per hour, the car hits a brick wall, and the child is ejected from the car.  Additionally, Dr. Cowan testified that it took a significant amount of energy applied to S.K.’s brain to cause her head injuries.  He stated that the person who caused S.K.’s injuries would have been reasonably certain to know that the injuries were going to cause her death.  Dr. Cowan analogized S.K.’s injuries to those received in “motor vehicle crashes, especially where a patient may be unrestrained and is ejected from the car, land[ing] on a hard surface, or the rollover of the car and the head beingསྭ the child being bounced around inside the car.”  He also stated that her injuries were analogous to a child riding a bicycle, being hit by a car, and the child being thrown through space and hitting a hard object.  Dr. Cowan testified that of the fifteen to twenty children he had seen with similar injuries, S.K.’s injuries ranked in the top five in severity.  In addition, Dr. Natarajan stated that S.K.’s injuries were the result of a “violent trauma.”  

Further, S.K. was in appellant’s sole care on July 1, the day before she received her head injuries, when she received the large burn on her back.  Dr. Krouse testified that the burn was suspicious because of its location (i.e., the burn was not on the protruding parts of her back, but instead was in the center of her back).  Additionally, Dr. Cowan said that the burn on S.K.’s back appeared to have been inflicted and that it was suspicious because of its location.  Dr. Natarajan also opined that the burn was suspicious.

Additionally, we must take into account the extent of the injuries and the relative size and strength of the parties.  
Lindsey v. State
, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973), 
cert. denied
, 416 U.S. 944 (1974).  Appellant was a college football player and was five foot eight to five foot ten inches tall and weighed between one hundred eighty and two hundred pounds.  S.K., on the other hand, was only sixteen months old and was twenty-nine and one-half inches tall and weighed eighteen pounds, nine ounces.  We hold that the evidence, when viewed in the light most favorable to the verdict, supports a determination beyond a reasonable doubt that appellant knowingly inflicted S.K.’s injuries. 

Additionally, when viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary proof that it would not support the finding of guilty beyond a reasonable doubt. Thus, having held that the evidence was legally and factually sufficient to show that appellant injured S.K. and that he had the requisite mental state, we overrule appellant’s eighth point.
 

XI.  Lesser-Included Offense Instructions

In his ninth point, appellant contends that the trial court abused its discretion by denying his requested jury charge instructions on criminally negligent homicide and manslaughter.  Appellant argues that evidence was presented to the jury that entitled him to an instruction on the lesser-included offenses.

A.  Standard of Review

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense.  
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  First, the lesser-included offense must be included within the proof necessary to establish the offense charged.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  The offense must also comport with article 37.09 of the Texas Code of Criminal Procedure.  
Tex. Code Crim. Proc. Ann.
 art. 37.09 (Vernon 1981); 
Moore v. State
, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).

A lesser-included offense is defined both in terms of the offense charged and the facts of the case.  
Tex. Code Crim. Proc. Ann
. art. 37.09(1).  Therefore, our analysis of whether an offense is a lesser-included offense of the charged offense must be made on a case-by-case basis.  
Bartholomew v. State
, 871 S.W.2d 210, 212 (Tex. Crim. App. 1994); 
Day v. State
, 532 S.W.2d 302, 315-16 (Tex. Crim. App. 1976) (op. on reh’g).  It does not matter if the charged offense can be established on a theory that does not contain the lesser offense; the issue is whether the State, when presenting its case to prove the offense charged, also includes proof of the lesser-included offense under article 37.09.  
See 
Tex. Code Crim. Proc. Ann.
 art. 37.09; 
Bartholomew
, 871 S.W.2d at 212; 
Broussard v. State
, 642 S.W.2d 171, 173 (Tex. Crim. App. 1982).

B.  Applicable Law

Penal code section 19.04 provides that “a person commits an offense [of manslaughter] if he recklessly causes the death of an individual.”  
Tex. Penal Code Ann.
 § 19.04(a).  “A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.”  
Id.
 § 6.03(c) (Vernon 2003).  “The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.”  
Id.  

Section 19.05 defines criminally negligent homicide.  
Tex. Penal Code Ann.
 § 19.05.  Section 19.05 provides, “A person commits an offense if he causes the death of an individual by criminal negligence.”  
Id.  
Section 6.03(d) defines criminal negligence: 

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.  

Id. 
§ 6.03(d).

A person commits the offense of injury to a child if “he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury.” 
 Id.
 § 22.04(a)(1) (Vernon Supp. 2005).  Section 1.07(46) defines serious bodily injury as “bodily injury that creates a substantial risk of death 
or that causes death
, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.”  
Id.
 § 1.07(46) (Vernon Supp. 2005) (emphasis added).  

C. Applicable Facts

Dr. Krouse testified that on July 4, 2002, he examined S.K.’s body and performed her autopsy.  He stated that she had bruises behind her right ear, on the back of her right ear, and on the right side of her forehead.  S.K. also had reddening on the back of her head that overlay a large area of bruising underneath her scalp.  Dr. Krouse testified that the burn on S.K.’s back was suspicious because he would expect the burn to be on the skin that protrudes (i.e., the shoulder blades) and not on the middle part of her back.  He stated that appellant’s explanation that S.K. received the burn by leaning against the oven door was not plausible.

Dr. Krouse also testified that there was a large area of bruising under S.K.’s scalp and that there was some bleeding in the area where the skull bones run together.  He stated that there was an impact point on the back upper center part of S.K.’s head.  Dr. Krouse testified that S.K. sustained blunt injury to her head and that he found blood on S.K.’s brain that was not supposed to be there.  When he dissected S.K.’s eyes, Dr. Krouse stated that there was bleeding in multiple layers and locations in her eyes.  He stated that the bleeding in S.K.’s retina is a good indication that she suffered from a blunt head injury.

Dr. Krouse further testified that he could not determine what contacted with S.K.’s head, but that the object most likely had a flat or gently curved surface.  He said that the manner in which the object was used was capable of causing death or serious bodily injury.  Additionally, he testified that after S.K. sustained her head injury, she would almost certainly have been unconscious immediately, and that if she regained consciousness, she would have been symptomatic within seconds to minutes.  The symptoms would include abnormal mentation and behavior, irritability, somnolence, sleepiness, and seizures.  He said that he would expect her to be somnolent, if not unconscious, within ten to fifteen minutes to thirty minutes.  He analogized S.K.’s injuries to her being in an unrestrained car seat and hitting a brick wall at thirty miles per hour.

On cross-examination, Dr. Krouse stated that it is possible for a person to be unconscious and then regain consciousness, but that he or she would function at a reduced capacity.  He said that it would be obvious to an observer that S.K. was not at full capacity.  Dr. Krouse testified that it would be unlikely that after a serious and eventually lethal head injury a person would appear relatively normal as some believe occurs with head injuries.  He stated that although lucid intervals are not common, they do occur.

Dr. Krouse also testified that S.K.’s injury had to have occurred within twenty-four to thirty-six hours preceding her death, but that he could not definitively pinpoint the time of the injury.  He stated that the injury was consistent with swinging S.K.’s torso and her head striking a porcelain surface, sink, or counter. However, Dr. Krouse testified that the injuries were not consistent with dropping S.K. from a standing height to the floor; rather, they were consistent with forcibly taking S.K. and flinging her to the floor.
(footnote: 11)
 Dr. Cowan testified that S.K. arrived at the emergency room at 7:20 p.m. on July 2, 2002.  He stated that the paramedics were doing CPR on S.K. when she arrived, but that she did not have a heartbeat or pulse.  However, Dr. Cowan was able to get a pulse after injecting medication into S.K.’s bone marrow.

After obtaining a pulse, Dr. Cowan did a primary survey of S.K.’s body and testified that the burn on her back was suspicious because of its location. He testified that he believed that the burn was an inflicted injury and that S.K. did not do it herself.  Additionally, Dr. Cowan stated that S.K. had a rib fracture that was inconsistent with CPR.  He stated that it was a fairly new buckle fracture and that it would take a tremendous amount of force to cause the fracture.  Dr. Cowan testified that the CAT scan revealed S.K.’s severe head injuries.  He further stated that S.K. had retinal hemorrhages in both of her eyes that are usually caused by a severe shaking force.  He stated that the person who caused the injuries would have been reasonably certain to know that he was causing the child’s death.

Dr. Cowan also testified that S.K. would have been symptomatic almost immediately (i.e., within minutes) and that she would have been unconscious fairly quickly.  Dr. Cowan said that he was not surprised that S.K.’s skull did not have a fracture or laceration because a fracture or laceration depends on the force and the way the energy from the impact went to her skull and brain. He testified that not all head injuries include fractures and lacerations. Additionally, he stated that S.K. would not have been able to eat or drink and that if someone walked by her after she received the injuries, they would think that she was asleep.  Dr. Cowan testified that S.K. would have experienced abnormal breathing patterns fairly quickly.

Further, Dr. Cowan stated that the injuries must have been inflicted between one hour and one and one-half hours before S.K. was admitted to the emergency room.  He stated that she arrived at 7:20 p.m., so the injuries most likely occurred between 6:00 and 6:30 p.m.  He testified that the injuries could not have occurred at 4:00 p.m. or 5:00 p.m. because of the extent of the head injuries. 

D.  Analysis

The trial court charged the jury on capital murder as murder of a victim under the age of six.  Additionally, the trial court charged the jury with appellant’s requested instructions on recklessly causing bodily injury to a child and causing injury to a child by criminal negligence, but did not give the instructions on manslaughter or criminally negligent homicide.  
See 
Tex. Penal Code Ann.
 §§ 19.04(a), 19.05, 22.04.  The court of criminal appeals has recognized that manslaughter and criminally negligent homicide are both lesser-included offenses of capital murder.  
Cardenas v. State
, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000).  Additionally, injury to a child is a lesser-included offense of capital murder.  
Tex. Code Crim. Proc. Ann.
 art. 37.09; 
Paz v. State
, 44 S.W.3d 98, 101 (Tex. App.—Houston [14th Dist.] 2001, pet. dism’d).  Therefore, the first prong of the 
Rousseau
 test has been met, and we must decide whether the record contains some evidence that would permit a jury to rationally find that appellant is guilty only of the lesser-included offenses of manslaughter and criminally negligent homicide.  
Rousseau
, 855 S.W.2d at 672-73.

Appellant contends that there is ample evidence to show that he had the culpable mental states of criminal negligence and recklessness and that he was therefore entitled to the lesser-included offense instructions of manslaughter and criminally negligent homicide as well.  As support for his contention, appellant cites to his three written statements, State’s exhibits four, thirteen, and nineteen.

In his July 2, 2002 statement, State’s exhibit four, appellant stated that he got home from school that day at 3:30 p.m. and that Roxane left for school at 4:00 p.m.  After Roxane left, S.K. was in appellant’s sole care.  At approximately 5:30 p.m., S.K. woke up, but then went right back to sleep.  According to this statement, S.K. woke up again at 6:10 p.m. and appellant fed her Vienna sausages and juice.  Appellant stated that S.K. went back to sleep at 6:30 p.m.  Appellant went into S.K.’s room when he heard her choking.  In a panic, appellant shook S.K. to try to get her attention, but she did not respond.  Appellant then called 911.  Appellant stated that he was holding both S.K. and the phone at this time and that while he was running to the front door, S.K.’s “head hit the ground.”
(footnote: 12) 

In appellant’s July 9, 2002 statement, State’s exhibit nineteen, he said that S.K. had not been feeling well on July 2, 2002 and that she had thrown up twice.  After the second time she threw up, appellant gave S.K. Vienna sausages to eat, but after noticing that she was throwing them on the ground, he laid her down in the middle of a queen size bed to sleep.  After approximately fifteen to twenty minutes, appellant heard a sound coming from the bedroom and when he went in to check on S.K., he noticed that she was breathing funny and that she was making a gasping noise.  After watching her for a while, appellant thought that she was okay, so he left the room.  Appellant then stood outside the room and when he went back in to check on her again, he noticed that “something was not right.”  When he went over to S.K., he tried to determine if she was breathing because she was making gasping noises again.  Appellant then called out S.K.’s name to see if she would answer, and he shook her.  S.K. did not respond and her head was cool to the touch.  Appellant panicked and picked her up and when he was racing out of the bedroom, S.K.’s head “could have struck the door or the door frame.”  However, appellant could not remember if S.K.’s head actually hit the door or the door frame.  

In appellant’s July 12, 2002 statement, State’s exhibit thirteen, he stated that between 5:00 and 5:15 p.m., he went into S.K.’s room where she was sleeping and saw that she had thrown up in her bed.  He cleaned S.K.’s bed and left the room.  Appellant further said that between 5:30 and 5:45 p.m., he went back into S.K.’s room and woke her up after noticing that she had thrown up again.  After waking her up, appellant took S.K. into the bathroom and cleaned her off in the sink.  While he was bathing her, S.K. began kicking her legs and flung “her head back and hit the sink and it made a thud sound.”  When he finished cleaning her, appellant dried her off and put her in new clothes and then fed her Vienna sausages.  After realizing that S.K. was tired, he put her in her bed between 6:10 and 6:20 p.m.  Appellant further stated that he was “certain that [S.K.‘s] head bumped the door when [he] ran by, in a panic to get to the phone to call the police.”

Additionally, appellant argues that his statements during interviews with Holden are ample evidence to show that he had the required mental states for criminally negligent homicide and manslaughter.  At trial, Holden testified that he interviewed appellant on July 18, 2002.  Holden stated that he interviewed appellant twice that day and that appellant gave different stories on both occasions.  In appellant’s first interview, he told Holden that S.K. had been vomiting and that while he was cleaning her off in the sink, she was squirming and hit the back of her head on the inside of the sink between five and ten times.  Appellant repeatedly told Holden that he never caused S.K. to hit her head.  Appellant told Holden that after he finished cleaning her off, he attempted to feed her Vienna sausages, but she would not swallow them and kept spitting them out.  He then put S.K. to bed.  While she was sleeping, appellant heard S.K. gasping for air, and he went into her room, picked her up, and called 911.  

In appellant’s second interview, he told Holden that while he was giving S.K. a bath, she was squirming a lot.  He stated that at one point S.K. pulled herself up and sat on his arm.  Appellant said that he swung S.K.’s torso back down and that this caused the back of her head to hit the sink with a “thud.”  When she hit her head, S.K. quit moving and appellant said that he should have called 911 right away, but that he did not.  However, appellant finished cleaning her and then tried to feed her, but the food fell out of her mouth and she would not chew.  Appellant then put her back in bed and while she was sleeping, he heard her gasping for air, so he called 911.

1.  Error Analysis

There was no direct evidence regarding appellant’s intent to kill or injure.  
See Saunders v. State
, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992).  The evidence simply showed that S.K. was in appellant’s sole care the day she received a large, suspicious burn on her back, that S.K. was most likely in appellant’s care when she received the fatal head injuries, and that S.K.’s injuries were so severe that a person would have been reasonably certain to know that he or she was going to cause her death.  
See id. 
(stating only evidence linking the defendant with crime was evidence that showed he squeezed baby’s head fifteen days before baby’s death).  However, appellant’s statement to Holden that he should have called 911 
right away
 after S.K. hit her head in the sink and stopped moving is evidence from which the jury could have reasonably inferred that appellant was aware of, but consciously disregarded, the substantial risk that his actions could cause, at the least, serious bodily injury to S.K., and at the most, death.
(footnote: 13)  Although other evidence existed from which a jury could conclude that appellant knew his treatment of S.K. would kill her, a rational jury could also conclude, based on appellant’s statement to Holden, that appellant was aware of, but consciously disregarded, a substantial risk that death would occur.  
See id
.  Accordingly, under the latter interpretation, appellant could have been guilty only of manslaughter.  Because the evidence raises the issue of whether appellant was reckless in causing S.K.’s death, he was entitled to a lesser-included offense instruction for manslaughter.  Thus, we conclude that the trial court erred by refusing to instruct the jury on manslaughter.

But the same evidence also negates the mental state necessary for the lesser-included offense of criminally negligent homicide—that appellant ought to have been aware of, but failed to perceive, the risk of death.  Accordingly, we hold that the trial court did not err by refusing to instruct the jury on the lesser-included offense of criminally negligent homicide.  
See Graham v. State
, 657 S.W.2d 99, 101 (Tex. Crim. App. 1983) (holding that an instruction on criminally negligent homicide is proper when the defendant fails to perceive the risk of resulting death which rises to the level of gross deviation from an ordinary standard of care).

2.  Harm Analysis

Having determined that the trial court erred by denying appellant’s requested instruction on manslaughter, we must determine whether the error was harmful.  Appellate review of error in a jury charge involves a two-step process.  
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error occurred.  If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.  
Id.
 at 731-32.  Error in the charge, if timely objected to in the trial court, requires reversal if the error was “calculated to injure the rights of [the] defendant,” which means no more than that there must be 
some
 harm to the accused from the error.  
Tex. Code Crim. Proc. Ann
. art. 36.19 (Vernon 1981); 
see also Abdnor
, 871 S.W.2d at 731-32; 
Almanza v. State
, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).  In other words, a properly preserved error will call for reversal as long as the error is not harmless.  
Almanza
, 686 S.W.2d at 171.  In making this determination, “the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.”  
Id.
; 
see also Ovalle v. State
, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

The error’s harmfulness must be measured, at least in part, against the likelihood that the jury’s verdict was actually based on another theory of culpability unaffected by the erroneous jury charge. 
 Otting v. State
, 8 S.W.3d 681, 689 (Tex. App.—Austin 1999, pet. ref’d, untimely filed); 
see Atkinson v. State
, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996); 
Govan v. State
, 682 S.W.2d 567, 570 (Tex. Crim. App. 1985), 
overruled on other grounds
, 
Brown v. State
, 716 S.W.2d 939, 945 (Tex. Crim. App. 1986).  The court of criminal appeals has held that the determination of harm is essentially automatic when the defendant is entitled to lesser-included offense instructions, but fails to get the instructions, and the sole option for the jury is to convict the defendant of the charged offense or acquit him.  
See Otting
, 8 S.W.3d at 689; 
see also Saunders v. State
, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995).  

However, a different situation is presented if the trial court submitted one lesser-included offense raised by the evidence while declining to submit another that was also raised.  
Otting
, 8 S.W.3d at 689.  Under these circumstances, the risk that the jury will convict of the greater offense despite its reasonable doubt is not so apparent.  
Saunders
, 913 S.W.2d at 572; 
Otting
, 8 S.W.3d at 689.  It is at least arguable that a jury believed the defendant committed an uncharged lesser-included offense, but was unwilling to acquit him of all wrongdoing, and therefore inclined to compromise, would opt for a lesser-included offense that 
was 
submitted rather than convict him of the greater offense.  
Saunders
, 913 S.W.2d at 572.  That it did not do so may indicate that the failure to give the other lesser-included offense instruction was harmless error.  
Otting
, 8 S.W.3d at 689.  

Here, the jury was not required to convict appellant on the greater offense of capital murder or to acquit.  The trial court instructed the jury on the greater offense of capital murder and the offenses of knowingly causing serious bodily injury, recklessly causing serious bodily injury, and causing serious bodily injury by criminal negligence.

We have already determined that appellant was not entitled to the lesser-included offense instruction on criminally negligent homicide.  Thus, he likewise was not entitled to the charge he received on causing serious bodily injury by criminal negligence.

Manslaughter, the instruction appellant was denied, and recklessly causing serious bodily injury, the charge he was given, are both second degree felonies and carry the same range of punishment.
(footnote: 14)  
See 
Tex. Penal Code Ann.
 § 19.04, 22.04(e); 
Otting
, 8 S.W.3d at 690.  Additionally, both involve the same culpable mental state of recklessness.  
See 
Tex. Penal Code Ann.
 § 19.04, 22.04(e).  Moreover, serious bodily injury is defined to include death such that reckless serious bodily injury is also a lesser-included offense of capital murder.  Here, the jury, by its verdict, obviously rejected the offenses with the culpable mental state of recklessness.  
See Otting
, 8 S.W.3d at 690.  If appellant was guilty of manslaughter, he was also guilty of recklessly causing serious bodily injury, an offense with the same range of punishment which the jury chose to bypass.  
See id. 
 This demonstrates the likelihood that the jury’s verdict was unaffected by the erroneous jury charge.
(footnote: 15)  
Id.
; 
see also Atkinson
, 923 S.W.2d at 27.  We conclude that the trial court’s error in refusing to instruct the jury on the lesser-included offense of manslaughter was harmless.  Thus, we overrule appellant’s ninth point.

XII.  Jury Argument

In his tenth point, appellant complains that the trial court abused its discretion by allowing the State to make an improper jury argument during closing arguments. 

A. Applicable Law

To be permissible, the State’s jury argument must fall within one of the following four general areas:  (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. 
 Felder v. State
, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992), 
cert. denied
, 510 U.S. 829 (1993); 
Alejandro v. State
, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

If a jury argument exceeds the bounds of proper argument, the trial court’s erroneous overruling of a defendant’s objection is not reversible error unless it affected the appellant’s substantial rights.  
Tex. R. App. P. 
44.2(b); 
Martinez v. State
, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000); 
Mosley v. State
, 983 S.W.2d at 659.  In determining whether the appellant’s substantial rights were affected, we consider (1) the severity of the misconduct (i.e., the prejudicial effect of the prosecutor’s remarks), (2) curative measures, and (3) the certainty of conviction absent the misconduct.  
Martinez
, 17 S.W.3d at 692-93; 
Mosley
, 983 S.W.2d at 259.

B.  Applicable Facts

During closing argument, the prosecutor stated,

On July the 1st, 
after being alone in [appellant’s] care for three hours, [S.K.] sustained a second-degree burn.  And [appellant], after talking his way out of it, was given the benefit of the doubt.

On July the 2nd, she was left alone in his care for three hours, and two days later[,] her little body was on a gurney in a morgue for an autopsy.  

The time for giving [appellant] the benefit of the doubt is over.
  [Emphasis added.]  

Appellant objected on the basis that the prosecutor’s statement was “a contravention of the reasonable doubt instructions provided by the [c]ourt.”  The trial court overruled appellant’s objection.

C.  Analysis

The law provides for and presumes a fair trial, free from improper argument by the prosecuting attorney.  
Borjan v. State
, 787 S.W.2d 53, 56 (Tex. Crim. App. 1990);
 Dickinson v. State
, 685 S.W.2d 320, 322 (Tex. Crim. App. 1984).  Here, appellant argues that the prosecutor’s comment could have led the jury to determine that they did not need to determine the facts beyond a reasonable doubt.  The State contends that the prosecutor was summing up all of the evidence and showing that the State had met its burden of proof.  We agree.  Moreover, the trial court properly charged the jury with an instruction on reasonable doubt.  We conclude that the State’s jury argument did not shift the burden of proof but, instead, summarized the state of the evidence and was a reasonable deduction drawn from the evidence.  
See Caron v. State
, 162 S.W.3d 614, 618 (Tex. App.སྭHouston [14th Dist.] 2005, no pet.).  Therefore, we hold that the trial court did not abuse its discretion by overruling appellant’s objection to the State’s argument.  We overrule appellant’s tenth point.

XIII.  Conclusion

Having overruled appellant’s ten points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED: April 27, 2006

FOOTNOTES
1:
Robert and Roxane were married when Roxane met and moved in with appellant.  

2:
Roxane testified that she did not take S.K. when she left in December because Robert would not let her.

3:
By this time, Roxane was working at a Kohl’s department store. 

4:
Roxane called Kohl’s on July 1 and told them that she was not going to be able to work for two days.

5:
This was appellant’s second trial for this offense.  On December 15, 2003, the trial court discharged the jury after it could not reach a unanimous decision.

6:
Sims stated that her husband had served a four-year sentence and a three-year sentence in Chicago and that she married him approximately one year before serving as a veniremember.

7:
State’s exhibits twenty-three and twenty-four depict bleeding underneath S.K.’s scalp when her scalp was pulled back, and exhibit twenty-five showed bleeding under her scalp when her scalp was pulled forward over her face.  

8:
Appellant points to this testimony to support his contention that he did not inflict S.K.’s injuries.  However, there was no testimony that this bruise was the injury that resulted in S.K.’s death.

9:
On July 2, 2002, Roxane stayed at home with S.K. because of her burn until approximately 4:00 p.m. when appellant arrived at home.  After Roxane left for school shortly after appellant got home, S.K. was in appellant’s sole care until the paramedics arrived at 6:50 p.m.  

10:
In appellant’s written statement, he claimed that he fed S.K. Vienna sausages at 6:00 p.m.

11:
In one of appellant’s versions of events, he stated that he might have dropped S.K. when he was holding her.

12:
The record shows that appellant made the 911 call at approximately 6:50 p.m.

13:
Appellant’s admission that he should have called 911 
right away
 indicates his awareness that immediate medical care was critical. 

14:
A second degree felony carries a punishment of “imprisonment in the institutional division for any term of not more than 20 years or less than 2 years.”  
Tex. Penal Code Ann.
 § 12.33(a) (Vernon 2003).

15:
In 
Chase v. State
, a capital murder case in which the jury acquitted the defendant of the greater charge, but convicted him of the lesser-included offense of recklessly causing serious bodily injury, the Eastland court of appeals held that it was harmful error for the trial court to deny a lesser-included offense instruction on manslaughter because the prosecutor made comments during the punishment phase that could have led the jury to assess appellant’s punishment for reckless serious bodily injury at the maximum range when it might not have done so on manslaughter. 
 
968 S.W.2d 943, 946 (Tex. App.—Eastland 1998, pet. ref’d.).  However, that case is inapposite because, here, the jury convicted appellant of the greater charge.