Affirmed as Modified and Opinion filed December 13, 2007








Affirmed as
Modified and Opinion filed
December 13, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00724-CR

____________

 

TAMEKA NICHOLE MARTIN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 179th
District Court

Harris County, Texas

Trial Court Cause No. 1059819

 



 

O P I N I O N








A jury found appellant, Tameka Nichole Martin, guilty of
the brutal capital murder of her ten-month-old baby girl.  See Tex.
Penal Code Ann. '' 19.02(b)(1), 19.03(a)(8) (Vernon 2003). 
The trial court assessed punishment at incarceration for life in the Texas
Department of Criminal Justice, Institutional Division.  In four issues,
appellant challenges the legal and factual sufficiency of the evidence, the
trial court=s failure to charge the jury on the lesser included
offense of injury to a child, and the trial court=s admission of
expert testimony regarding appellant=s intent. 
Appellant also requests correction of the judgment=s recitation of
punishment because it improperly reflects that the jury assessed punishment. 
It is clear from the record the judge assessed appellant=s punishment;
therefore we modify the judgment to reflect that the judge, not the jury
imposed punishment.[1] 
We affirm the judgment as modified.

Factual and Procedural Background

At approximately 6:30 a.m. on Monday, September 8, 2003,
appellant woke up her ten-month-old infant, D.D., and noticed D.D.=s eyes were
swollen.  Concerned about D.D.=s condition, appellant called her mother,
Elaine Sanders, at work and told her D.D. was sick and needed to go to the
hospital.  Sanders told appellant she was unable to get off work.  Appellant
also spoke with Willie Mae Cains, D.D.=s paternal
grandmother, who worked with Sanders.  Cains told appellant to call 9-1-1, and
appellant informed Cains she would take D.D. to the hospital.  Instead of
calling 9-1-1, appellant called her grandmother, and her grandmother told her
to put Vaseline on the baby=s eyes.  At some point, appellant also
called her aunt and asked her aunt for a ride to the hospital.  Around 7:30
that morning, the daycare bus came to pick up D.D., and appellant informed the
driver D.D. would not be attending daycare that day.  Appellant had no
explanation for why she did not ask the daycare bus to take her to the hospital
other than she did not think D.D.=s injuries were
too serious.  Appellant continued to wait for her aunt to pick her up.

Around 1:00 or 1:30 p.m., Billy Davis, D.D.=s father, arrived
at appellant=s apartment.  Cains called Davis earlier that morning
and told him to go check on D.D.  Because of her earlier conversation with
appellant, Cains told Davis D.D. was at a hospital, so Davis rushed to two
different hospitals before learning D.D. was still at appellant=s apartment. 
Immediately upon arriving at appellant=s apartment, Davis
noticed D.D.=s eyes were swollen, one of her eyeballs looked
crooked, and she was not responding.  Davis attempted to call 








9-1-1,
but appellant grabbed the phone out of his hand.  Davis then went to a neighbor=s apartment, asked
to use her phone, and called 9-1-1. 

Don Larson, Senior Captain with the Houston Fire
Department, arrived on the scene at 1:38 p.m.  Larson arrived before the
ambulance, so he briefly assessed D.D.=s condition. 
Larson testified D.D. was lethargic, moving slowly, her eyelids were swollen,
and she did not feel feverish.  Larson testified he did not take the baby=s diaper off or
pick her up.  He also testified he found no outward signs of trauma, but
admitted closed head injuries were often hard to see.  Larson also testified it
is often more difficult to notice bruises on a dark-skinned baby.  When the
ambulance arrived, Larson turned the patient care over to the paramedic.

Daniel Caballero, a paramedic with the Houston Fire
Department, arrived on the scene around 1:42 p.m.  Upon arriving at the scene,
Caballero assessed the baby.  Caballero testified he did not notice any trauma
on the baby in the form of big bruises, deformities, or bleeding.  He testified
the baby was breathing a little fast, her skin was warm and dry, her heart beat
was normal, and her response to stimuli seemed normal.  Caballero testified he
took off D.D.=s diaper to check for injuries and he did not notice
anything unusual.  He also testified he did not notice any bruises on D.D. or
redness near her vaginal area and around her nose.  It was not until the
hospital nurse pointed it out to him that Caballero noticed the bruises on D.D.=s forehead and
pelvis and her deviated eye.  Caballero also testified no person at the scene
could have realized D.D. had head trauma, and there was nothing obvious to him
indicating something was substantially wrong with the baby.  However, Caballero
admitted on direct examination this was his first baby case and he did not feel
confident.  He also admitted on redirect the baby=s position in her
car seat, the color of her skin, and the lighting in the apartment could have
all been factors in why he missed some of her injuries.








After arriving at the scene, Caballero and another
paramedic transported D.D. to the hospital.  Caballero testified appellant did
not act as if she was in a hurry to get to the hospital.  He testified
appellant did not request to sit in the back of the ambulance with D.D., but
instead she sat in the front seat talking and laughing with the driver. 
Caballero also testified on the way to the hospital he attempted to ask
appellant some additional questions about D.D.=s history and
appellant became angry with him.

D.D. arrived at the Texas Children=s Hospital around
2:40 p.m. and spent approximately two hours in the emergency center.  The
hospital then moved D.D. to the Pediatric Intensive Care Unit.  Four days
later, on September 12, 2003, D.D. died of craniocerebral trauma.

Dr. Coburn Allen was the attending physician in the
emergency center at Texas Children=s Hospital the
afternoon D.D. was admitted.  Dr. Allen testified when he first saw D.D. she
was actively seizing, grossly abnormal, and only responding to painful
stimuli.  He testified D.D. had obvious bruising on her forehead, her scalp,
her nose, her upper thigh, and her inguinal groin area.  In addition, D.D.=s eyes were
deviated.  Dr. Allen testified based on D.D.=s symptoms he
immediately suspected she had a serious head injury, so he placed D.D. on a
ventilator.

While Dr. Allen cared for D.D. in the emergency room,
another doctor conducted the primary interview with the family to determine
D.D.=s past medical
history.  During the initial interview, appellant told the doctor she did not
know what happened to D.D. and that she just found her in that condition.  Dr.
Allen later spoke with appellant in the emergency room, and he testified
appellant appeared disinterested in her child and aloof.  He testified the way
appellant was whispering on her phone was very bizarre to him, and his gut
instinct was she was developing her story.








Sometime after being admitted to the emergency room, Dr.
Allen sent D.D. to have a CT scan.  Dr. Allen testified the CT scan revealed
D.D. had significant trauma to the left side of her brain.  He testified the
left side of the brain was swollen and pushing over onto the right side, which
is called herniation.  Dr. Allen also testified this type of injury was highly
inconsistent with a minor head injury.  Instead, he testified this type of
accident was similar to crashing in a high speed motor vehicle accident,
falling from a roof, or being hit with a baseball bat.  Dr. Allen testified
these types of injuries would cause the child to be profoundly sleepy, and it
would be shocking if a child was  able to eat or even wake up after such
trauma.  Dr. Allen stated he A[could not] imagine anyone [who was] able
to hear and speak and talk and walk that would not recognize a child like this
to be terribly abnormal and very, very unresponsive.@

In addition to the trauma to her brain, D.D. suffered
trauma to her body as well.  Dr. Allen testified D.D. suffered from
malnutrition and multiple broken bones.  After conducting x-rays, Dr. Allen
discovered D.D. suffered from a fresh femur fracture on top of an old femur
fracture.  The femur fractures were categorized as spiral fractures, which are
most often caused by severe jamming or twisting of the leg.  He explained that
this type of femur fracture occurs in accidents such as a severe motor vehicle
crash.  Dr. Allen testified this type of fracture on a child is highly
consistent with child abuse.  Also, D.D. suffered from multiple fractures in
her arms and shoulders.  Dr. Allen testified these types of injuries were very
rare and were typically caused by a high amount of force.  During trial, Dr.
Allen used a baby doll to demonstrate the amount of force necessary to cause
the type of broken bones D.D. suffered.








When asked his opinion, Dr. Allen testified D.D. Awas a severely
beaten child that died.@  Dr. Allen testified the injuries were Aall high speed,
high velocity injuries, which were directly intended to hurt [the] child.@  Dr. Allen
testified the retinal hemorrhages, the multiple broken bones, and the types of
fractures suffered were all indications of intentionally inflicted injuries. 
He also testified whoever killed D.D. would have immediately known she was
severely injured.  According to Dr. Allen, the symptoms of being severely
lethargic or comatose, not responding appropriately, seizing, and perhaps
vomiting would have occurred almost immediately from the time of injury.  Dr.
Allen further testified in the vast majority of cases a child suffering from
these types of head injuries would be highly symptomatic within four to six
hours, with the vast majority occurring in the first hour.  On
cross-examination, Dr. Allen admitted he could not pinpoint exactly when the
incident occurred, but he restated his opinion regarding the four to six hour
window of time when the symptoms most likely would have appeared.

Dr. Allen also testified to his opinion of how D.D. was
injured.  He testified the retinal hemorrhages D.D. sustained were a classic
condition in shaken baby syndrome, but shaking did not explain all of the
injuries D.D. suffered.  In addition, Dr. Allen opined that the obvious
bruising to the scalp with the associated contusion to the left side of the
brain was Aconsistent with blunt trauma hitting on the counter
surface, hitting with a hand, hitting with an object, [or] throwing on the
floor.@  Dr. Allen 
testified the child was basically beaten to death.  On cross-examination,
however, he admitted appellant=s lack of explanation for what happened to
D.D. was consistent with both child abuse and with appellant truly not knowing
what happened.








During trial, Dr. Lorna Gonsulan, the assistant medical
examiner at the Harris County Medical Examiner=s Office, also
testified regarding the injuries suffered by D.D. and her cause of death.  Dr.
Gonsulan testified the major finding relating to the death was a subdural
hemorrhage in the brain, which occurs when the space between the brain and the
dura bleeds.  In addition, D.D. had swelling in her brain, retinal hemorrhages,
and subarachnoid hemorrhages.  This combination of injuries is often referred
to as craniocerebral trauma or blunt force trauma to the head.  Dr. Gonsulan
also reviewed the x-rays and testified D.D. had a preexisting injury to her
femur which was in the process of healing and a fresh spiral fracture to the
same bone.  She testified a spiral fracture was a common injury in child
abuse.  In addition, Dr. Narula, the medical examiner who conducted the
autopsy, reserved tissue from the bone of D.D.=s left shoulder. 
Dr. Gonsulan dissected the tissue and observed D.D.=s left scapula had
a fresh fracture as well.  Dr. Gonsulan further testified she found a
hemorrhage on D.D.=s neck, which supports the evidence that
D.D. was subjected to severe blunt force trauma.  Dr. Gonsulan did admit it was
difficult to distinguish which injuries were a result of medical intervention
on the part of the hospital and which injuries were present when D.D. entered
the hospital, but she also testified the emergency room physicians, such as Dr.
Allen, would be a more reliable source regarding what injuries D.D. had upon
entering the hospital.

Dr. Gonsulan testified to her opinion regarding the effect
of D.D.=s injuries.  She
opined that injuries of the nature D.D. suffered would have caused instant loss
of consciousness.  She testified the child would not have cried, woken up, or
taken a bottle after enduring such trauma but, instead, would have been
immediately unresponsive.  On cross-examination, Dr. Gonsulan admitted she
could not specifically say how the injuries occurred; however, she testified
D.D.=s injuries were
consistent with someone shaking the child and/or slamming the child against an
object, striking the child with an object, or striking the child with a hand.








On the day D.D. was admitted to the hospital, Mary
Lawrence, a social worker at Texas Children=s Hospital,
interviewed appellant.  Lawrence testified at trial regarding the statements
made by appellant.  According to Lawrence, appellant told her she put D.D. to
bed around 9:30 p.m. on Sunday night and at that time, D.D. had no problems. 
At around 2:30 a.m., D.D. woke up and appellant fed her.  D.D. woke up again
around 5:15 a.m., and appellant changed her diaper.  At approximately 6:30
a.m., appellant woke D.D. up and noticed her eyes were swollen, so she decided
not to send D.D. to daycare.  Appellant then called her mother.  Appellant told
Lawrence no other person was responsible for D.D. on Saturday or Sunday. 
Appellant also told Lawrence her friend Marcus came to the apartment for about
one hour on Sunday but he was never alone with D.D.  Appellant said Marcus was
a friend and she did not know his last name.  In addition, appellant said she
called Cains and Cains told her to call 9-1-1.  According to appellant, she was
waiting for her aunt to come pick her up and take her to the hospital when D.D.=s father showed up
and called 9-1-1.  Appellant could not provide Lawrence with any explanation
for how D.D. was injured.  Lawrence testified she observed appellant=s demeanor during
her time at the hospital and at times appellant appeared tearful but at other
times Lawrence observed appellant laughing on the telephone.  In contrast,
Lawrence testified D.D.=s father, Davis, appeared very concerned
about D.D.








  Later that evening, after appellant=s interview with
Lawrence, Sergeant William Booth and Officer Connie Park, both from the Houston
Police Department, took appellant to the station to make a statement.  The
statement was taped and later transcribed into a written statement.  Booth
testified regarding the statement appellant made, the audio tape was played for
the jury, and the written transcript was introduced into evidence.  Appellant=s statement to the
police was inconsistent with her statement to Lawrence in many respects.  In
her statement, appellant told the investigating officers Marcus Green came over
on Sunday evening, and she left D.D. with him for around three hours so she
could do her laundry and run errands.  When appellant returned, Green told her
D.D. had thrown up because she had some bad milk, so appellant woke D.D. up and
changed her shirt.  Appellant told the officers she did not notice anything
wrong with D.D. at this time.  According to appellant, Green spent the night
with her Sunday evening, but he left the apartment around 10:00 p.m. and
returned around 3:00 or 4:00 a.m.  Appellant also told the officers D.D. slept
in the bed with her and Green, and D.D. woke up twice during the night, once at
1:30 a.m. and again around 5:30 a.m.  Appellant told the officers Green left
the apartment while she was waiting for a ride to the hospital, but did not ask
for a ride with Green because the woman who picked Green up did not like her. 
According to appellant, Green came back to the apartment shortly before the
ambulance arrived.  In addition, appellant told the officers Davis arrived at
her apartment around 1:00 p.m., and she did in fact take the phone away from
him because she believed he was calling his mother.  She stated she could see
the numbers Davis was dialing and it was not 9-1-1.  Appellant also stated she
did not call 9-1-1 because she did not think D.D.=s condition was
that serious.

During trial, Cains testified appellant often wanted Davis
to watch D.D. and would get mad if he refused.  According to Cains, on more
than one occasion, appellant told her if Davis did not come and pick up D.D.
she would throw the baby in the bathtub and drown her.  On the morning of
September 8, Cains testified appellant sent a 9-1-1 message to her mother, who
Cains worked with, telling her D.D.=s eyes would not
open.  Cains spoke with appellant and told her to call 9-1-1.  Cains testified
she could hear D.D.=s voice in the background and it was very
weak.  Cains testified appellant acted very calm on the phone.  Around 12:30,
Cains learned appellant had not gone to the hospital yet, so she called Davis
and told him the situation.  Later that afternoon, Davis called Cains and told
her D.D. had been taken to Texas Children=s Hospital.  Cains
testified while she was on her way to the hospital, appellant called her and
told her Ait didn=t look good@ and not to bring
Davis or she would Abust him in the face.@  Also, Cains testified
while they were all waiting in the emergency room, she observed appellant
laughing and talking on her cell phone.  After D.D. passed away, Cains
testified she spoke with appellant and appellant told her D.D. must have been
injured at daycare.  Cains testified that sometime later, appellant told her
someone at the hospital probably hurt D.D.








Davis testified D.D. cried a lot and it often got on
appellant=s nerves.  He testified appellant would call Davis
asking him to pick up D.D., and on three occasions, appellant said if he did
not pick D.D. up she was going to throw her in the bathtub and drown her. 
Davis also testified on Friday, September 5, appellant called him and asked if
he would keep D.D. because she wanted to go out.  Davis refused to keep D.D.
because he was watching appellant=s other child,
Delvan, at the time.  According to Davis, when he arrived at appellant=s apartment on
Monday, he immediately noticed D.D. was incoherent and her eyes were slightly
deviated and swollen.  Davis testified he immediately grabbed the phone to call
9-1-1, but appellant jerked the phone out of his hands.  Davis testified
appellant was cussing and yelling A[y]ou=re not fixing to
send those people to my house.  And if they come, I=m not opening the
door for them.@  At that time, Davis ran to the neighbor=s apartment and
called 9-1-1.  In addition, Davis testified he observed appellant in the
hospital room with D.D. and Ashe wasn=t even looking at
[the] baby. [She] [w]asn=t even paying attention to her.@  On
cross-examination, Davis denied ever telling appellant=s grandmother that
appellant did not injure D.D., and denied ever asking appellant=s aunt where
appellant=s boyfriend lived.

Marcus Green, appellant=s boyfriend,
testified he moved in with appellant for a couple of weeks, but he moved out
because the two argued too often.  Green testified  on two occasions he
overheard appellant tell Davis if he did not pick up the kids, she would drown
them.  Green further testified that on one occasion appellant actually went to
the bathroom and began running the water.  Green followed appellant into the
bathroom and took the stopper out of the tub.  Green admitted during trial he
did not initially tell the police about the bathtub incident because he did not
want to be involved.  Green=s mother encouraged him to tell the police
everything, so he later contacted the prosecutor.








Green also testified D.D. cried often and appellant often
ignored her.  Green testified on Sunday evening he went to appellant=s apartment, and
appellant asked him to watch D.D.  While he was watching D.D., she spit up, so
he changed her shirt and put her back to bed.  According to Green, when
appellant returned she changed D.D.=s shirt again and
put D.D. in the children=s room to sleep.  Green testified after
the baby went to sleep, he did not see or hear her again until the next
morning.  Green testified he spent the whole night at appellant=s apartment and he
could not remember whether appellant got up during the night; however, Green
admitted he most likely would not have woken up even if appellant did get up to
check on D.D.  The next thing Green remembered was appellant waking him up and
telling him about D.D.=s eyes.  Green remembers D.D=s eyes being
swollen and one looking a little crossed.  Green testified he never left
appellant=s apartment Monday while appellant was waiting for an
ambulance.  Green denied ever hurting D.D., twisting or pulling her leg,
jerking her arms, or ever getting really angry with her.  Green testified D.D.=s crying did not
get on his nerves.

Roslyn Gibson, the service coordinator and property manager
for appellant=s apartment complex, was at the apartment complex the
day the ambulance took D.D. to the hospital.  Gibson testified she was talking
with Hattie Holcombe, a resident of the complex, outside of Holcombe=s apartment Monday
afternoon when a young man approached them and asked to use Holcombe=s telephone. 
Gibson testified the man called 9-1-1 and then left.  After seeing the
ambulance arrive at the complex, Gibson went over to appellant=s apartment. 
Gibson testified she entered appellant=s apartment and
overheard appellant telling someone on the phone Athere [was]
nothing wrong with the baby.@  Gibson testified she checked on the
baby, and immediately upon seeing her, she noticed D.D. was not responding and
her eyes were rolling back in her head.  In addition, Gibson testified after
the paramedics put D.D. in the ambulance, they had to sound the sirens to get
appellant to come out of the apartment.  According to Gibson, appellant came
into the office after D.D. died and did not appear tearful or emotional. 
Appellant told Gibson she did not know how the baby died.








Sanders, appellant=s mother,
testified appellant called her at work Monday morning and told her D.D. was not
feeling well so she needed to go to the hospital.  Sanders testified appellant
sounded calm on the phone and that the situation did not sound too serious. 
According to Sanders, she was unable to get off work that day, so she could not
take appellant to the hospital; however, Sanders=s boss testified
she told Sanders she could leave work immediately and seek help for the baby. 
Sanders also testified appellant was emotional at the hospital and seemed
concerned for D.D.  Sanders testified no one at the hospital informed her
family of the seriousness of D.D.=s condition. 
Sanders testified it was not until later Monday night that Cains informed them
of D.D.=s critical
condition.  On cross-examination, Sanders denied making several statements
which were included in her police statement.

Appellant testified during trial as well.  Her story
regarding the night in question was, in many respects, similar to her police
statement.  However, at trial, appellant testified D.D. woke up twice during
the night, and the second time she woke up, appellant fed D.D. a little milk. 
Appellant testified she did not notice the bruises on D.D. nor did she realize
how critical D.D.=s injuries were, so she did not call
9-1-1.  Appellant also testified she jerked the phone out of Davis=s hand because she
thought he was calling his mother; however, on cross-examination appellant
admitted she lied to the police when she told them she could read the numbers
Davis was dialing.  Appellant denied making any statements about drowning D.D.
in the bathtub and denied ever hurting her baby.  Appellant testified Green was
the person who hurt D.D.  However, appellant also testified D.D. was responding
normally as late as 1:15 or 2:30 Monday morning and that Green did not hurt the
baby from 9:00 Sunday night to 6:30 Monday morning.








Throughout the trial, a past incident regarding D.D.=s leg was another
significant issue.  According to several workers from Peterson=s Child Care Development,
the daycare D.D. attended, they noticed something wrong with D.D.=s leg
approximately three weeks before D.D. died.  Nasreen Kahn testified when she
went to change D.D.=s diaper, she noticed something was wrong
with D.D.=s left leg.  D.D. would cry when she touched her left
leg.  Also, when D.D. would pull up in her crib, she would hold her left leg
up.  Both Kahn and T-Etta Gayles testified  a note was sent home in the baby=s diaper bag to
inform appellant.  Kahn testified D.D. came back the next day and her leg was
still hurt, so she once again informed Gloria Anderson, the supervisor and
appellant=s aunt, and Anderson told her to ignore it.  At some
point, according to Gayles, appellant informed the daycare she had taken D.D.
to the doctor and nothing was wrong with D.D.=s leg.  Anderson
testified appellant brought a yellow slip of paper from the doctor to the
daycare which stated D.D.=s leg was fine; however, this slip of
paper was missing from the daycare files.  

According to appellant, she received the note from the
daycare regarding D.D.=s leg.  Appellant testified she took D.D.
to the emergency room at the Doctor=s Hospital and
told the triage nurse D.D. had a cold, a cough, and a hurt leg.  Appellant
testified she saw the nurse write D.D.=s symptoms on her
chart.  In addition, appellant testified she asked the doctor to take x-rays of
D.D.=s leg.  In her
statement to the police, appellant told the officers the hospital took x-rays
of D.D.=s leg and informed
her nothing was wrong with it.  Hattie Martin, appellant=s grandmother,
testified appellant told her about the note from daycare, and she helped
appellant find a ride to the hospital that same night.  Martin also testified
appellant received a note from the doctor, which she took to the daycare center
the next day.

However, no hospital records existed confirming appellant=s testimony. 
Christy Martin, the assistant director of medical records at the Doctor=s Hospital,
testified she generated a summary of every visit D.D. made to the hospital. 
According to Martin, D.D. did visit the hospital on August 15, 2003, but her
only symptoms were fever, cough, and congestion.  Melanie Cannon, a triage
nurse at the Doctor=s Hospital, attended to D.D. on August 15,
2003.  Cannon testified appellant=s chief complaints
were fever, cough, and congestion.  Cannon testified she would have documented
it had appellant mentioned anything regarding D.D.=s leg.  Cannon did
admit on cross-examination she did a general assessment of D.D. and did not
notice any pain in D.D.=s leg.  Dr. Rolando Diaz, the doctor who
attended to D.D. on August 15, testified he also asked appellant what was wrong
with D.D., and she did not mention anything regarding D.D.=s leg.  Dr. Diaz
also testified he never ordered x-rays for D.D.=s leg.  In
response to this testimony, appellant and her family insisted certain records
from the hospital containing appellant=s complaint about D.D.=s leg were
missing.








The State also called witnesses to impeach appellant=s credibility. 
Trishina Houston testified she knew appellant back in 1999, and in her opinion,
appellant was a violent person.  According to Houston, appellant and four or
five other girls jumped Houston and beat her up because appellant thought
Houston said something bad about a guy.  John Joseph Lain, a police officer,
testified he was familiar with appellant prior to September 8, 2003, and in his
opinion, appellant was not a truthful person.  Additionally, throughout the
trial, the jury heard evidence that appellant was convicted of family violence
against Davis in January 2002 and convicted of theft by check and theft under
$50.00 in 2006.

The jury found appellant guilty of capital murder, and the
trial court sentenced appellant to incarceration for life.  This appeal
followed.

Discussion

A.      Did the
Trial Court Err in Allowing Dr. Allen to Testify Regarding the Perpetrator=s Intent?

In her fourth issue, appellant contends the trial court
reversibly erred when it allowed Dr. Allen to testify regarding the perpetrator=s intent.  More
specifically, appellant argues Dr. Allen was not qualified to give an expert
opinion regarding a perpetrator=s state of mind, and Texas courts have
traditionally rejected any attempt to testify to a perpetrator=s mental state. 
Because appellant challenges the legal and factual sufficiency of the evidence
supporting the verdict, we must first resolve this threshold issue involving
the admission of Dr. Allen=s testimony as it may affect the
sufficiency analysis.      

1.       Standard
of Review








An appellate court reviews a trial court=s decision to
admit or exclude evidence under an abuse of discretion standard. Burden v.
State, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001).  An abuse of discretion
will be found only when the trial judge=s decision was so
clearly wrong as to lie outside the zone of reasonable disagreement.  Cantu
v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).     

2.       Analysis

During Dr. Allen=s testimony, he
opined that whoever injured D.D. intended to hurt her.  The relevant portion of
the testimony is as follows:

Q:      (By Ms. Munier)  Is there any way
that the person, whoever did this B to the baby, that they did not mean to cause this baby=s death?

A:      No.

MS. SCARDINO:    Your Honor, that=s also outside his range and calls
for speculation.

THE COURT:          Overruled. 
Your question is did they intend to cause the death of the child?

MS. MUNIER:         Yes, sir.

THE COURT:          Okay.  I=m going to let him answer that if
he has medical expertise B he is an expert B and if he has an opinion on that.

THE WITNESS:      These are all
high speed, high velocity injuries, which were directly intended to hurt this
child.

Q:      (By Ms. Munier) To kill this child?

A:      To kill this child, to do as much bad things
to this child as it could.  This was not a minor punishment of this child. 
This is severe rage.  

We must first address the State=s contention that
appellant failed to preserve this complaint for appeal.  During trial,
appellant=s counsel objected by arguing the doctor=s testimony was Aoutside his range@ and Awould call for
speculation.@  The State argues these objections are not sufficient
to preserve a complaint regarding Dr. Allen=s qualifications
as an expert or regarding the testimony=s reliability and
relevance.  We disagree.  








To preserve error for appellate review, the complaining
party must make a timely and specific objection at the earliest possible
opportunity.  See Tex. R. App. P. 33.1; Armstrong v. State, 718
S.W.2d 686, 699 (Tex. Crim. App. 1985), overruled on other grounds by
Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998).  The generally
acknowledged policies of requiring specific objections are twofold.  First, a
specific objection is required to inform the trial judge of the basis of the
objection and afford him the opportunity to rule on it.  Neal v. State,
150 S.W.3d 169, 178 (Tex. Crim. App. 2004) (citing Zillender v. State,
557 S.W.2d 515, 517 (Tex. Crim. App. 1977)).  Second, a specific objection is
required to afford opposing counsel an opportunity to remove the objection or
supply other testimony.  Id. (citing Zillender, 557 S.W.2d at
517).  We believe the Aoutside his range@ objection was
sufficient to put the trial court and opposing counsel on notice appellant was
challenging Dr. Allen=s credibility as an expert and the
reliability of his testimony.  As evidence of this,  we look to the record
where the court responded to the objection by stating AI=m going to let him
answer that if he has medical expertise B he is an expert B and if he has an
opinion on that.@  We hold appellant lodged an adequate objection
and presented this issue for appellate review.

Appellant=s first argument regarding Dr. Allen=s testimony is
that he was not qualified to testify as an expert regarding a perpetrator=s state of mind. 
Rule 702 of the Texas Rules of Evidence provides Aif scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or education may testify
thereto in the form of an opinion or otherwise.@  Tex. R. Evid.
702.  In deciding whether to admit expert testimony, the trial court must
determine two things: (1) whether the witness is qualified as an expert, and
(2) whether scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue.  Powers
v. State, 757 S.W.2d 88, 93 (Tex. App.CHouston [14th
Dist.] 1988, pet. ref=d).  Additionally, Rule 704  states Atestimony in the
form of an opinion or inference otherwise admissible is not objectionable
because it embraces an ultimate issue.@  Tex. R. Evid.
704.








Dr. Allen was employed by the Baylor College of Medicine as
an assistant professor of pediatrics.  Dr. Allen testified he attended Baylor
Medical School, attended a pediatric residency for three additional years, and
then attended two fellowships for four years which was subspecialty training in
pediatric infectious diseases and pediatric emergency medicine.  Dr. Allen
testified he was triple board certified in pediatrics, pediatric emergency
medicine, and pediatric infectious diseases.  He also testified he had
experienced hundreds of injuries similar to D.D.=s injuries and
knew the injuries were generally consistent with child abuse.  Based on Dr.
Allen=s knowledge,
skill, experience, training and education, we conclude he was qualified as an
expert in regard to whether the injuries presented were intentional and not
accidental injuries.  Tex. R. Evid. 702.  Furthermore, whether the injuries
were intentional or accidental involved scientific, technical, or other
specialized knowledge and Dr. Allen=s testimony
assisted the jury in understanding the evidence and determining the fact at
issue.  








          Appellant
also argues Dr. Allen=s testimony is inadmissible because Texas
courts have traditionally rejected the attempt to offer any testimony, other
than that of the accused, concerning the defendant=s mental state at
the moment he committed the crime.  Appellant cites Whitmire v. State, Williams
v. State, and Winegarner v. State to support her proposition;
however, these cases are distinguishable from the facts in this case.  In the
three cases cited by appellant, the State attempted to admit the testimony of a
psychologist or a psychiatrist regarding their opinion on the defendant=s mental state at
the time he committed the crime.  Winegarner v. State, 505 S.W.2d 303,
305 (Tex. Crim. App. 1974); Whitmire v. State, 789 S.W.2d 366, 372 (Tex.
App.CBeaumont 1990,
pet. ref=d) abrogated by
McDonald v. State, 911 S.W.2d 798 (Tex. App.CSan Antonio 1995
pet. dism=d); Williams v. State, 649 S.W.2d 693, 696
(Tex. App.CAmarillo 1983, no pet.).  Appellant is correct when
she states Texas courts have traditionally rejected attempts to offer testimony
of the accused=s mental state; however, our research has shown these
cases involve a psychologist, a psychiatrist, or a lay witnesses=s opinion.  See
Arnold v. State, 853 S.W.2d 543, 547 (Tex. Crim. App. 1993) (holding lay
witnesses could not testify as to defendant=s state of mind
concerning willfulness); Jackson v. State, 548 S.W.2d 685, 692B93 (Tex. Crim.
App. 1977) (finding the trial court properly refused to permit a psychiatrist
to testify regarding defendant=s state of mind at the time of the alleged
offense); Avila v. State, 954 S.W.2d 830, 841 (Tex. App.CEl Paso 1997, pet.
ref=d) (holding the
trial court properly excluded an expert psychologist=s testimony
regarding appellant=s mental state).  In the majority of these
cases, the witness evaluated the defendant after the crime occurred and
attempted to testify that the defendant did or did not have the requisite mental
state at the time he or she committed the crime.  See Jackson, 548
S.W.2d at 692B93.  The main emphasis in the majority of these cases
focuses on the fact the witness lacks personal knowledge of the appellant=s state of mind,
and that, typically, the opinion is based on hearsay.  See Arnold, 853
S.W.2d at 547; Jackson, 548 S.W.2d at 692B93; Winegarner,
505 S.W.2d at 305.  

The facts in this case are distinguishable because we are
dealing with a medical doctor who examined the injuries sustained by D.D. and
testified about the extent of those injuries.  Dr. Allen testified that based
on his medical expertise and knowledge and considering the nature of the
injuries, it was his medical opinion that whoever injured D.D. did so
intentionally.  Essentially, Dr. Allen testified the injuries inflicted were
non-accidental injuries, and his determination was based on his medical
expertise, his past experiences, his examination of D.D., and his treatment of
D.D.=s injuries.  The
testimony at issue in this case is similar to testimony in cases resolved by
other Texas courts of appeals.  See Montgomery v. State, 198 S.W.3d 67,
82B83 (Tex. App.CFort Worth 2006,
pet. ref=d); Hernandez
v. State, 772 S.W.2d 274, 274B76 (Tex. App.CCorpus Christi
1989, no pet.); McKinny v. State, No. 01-89-00535-CR, 1990 WL 88582, at
*3B*4 (Tex. App.CHouston [1st
Dist.] June 28, 1990, pet. ref=d) (not designated for publication).  In
those cases, the appellate courts affirmed the admission of the testimony.  See
Montgomery, 198 S.W.3d at 83; Hernandez, 772 S.W.2d at 276; McKinny,
1990 WL 88582 at *4.    








In Montgomery, appellant was convicted of capital
murder of a child.  Montgomery, 198 S.W.3d at 72.  During trial, a
pediatric doctor testified the person who committed the violent assault against
the child would have been reasonably certain the baby would die.  Id. at
83.  On appeal, appellant complained the trial court erred in allowing an
expert witness to testify to a legal conclusion.  Id. at 82.  The Fort
Worth Court of Appeals held the doctor=s training,
experience, research, seminars, and periodicals qualified him as an expert and,
therefore, his testimony was proper.  Id. at 84.. 

In Hernandez, the appellant was convicted of
murdering the victim with a knife.  Hernandez, 772 S.W.2d at 275. 
During trial, the State called the Nueces County forensic pathologist and
Nueces County medical examiner Joseph Rupp to testify.  Id.  During
examination, the prosecutor asked Rupp whether, in his opinion, the wound to the
victim=s neck was
inflicted intentionally or accidentally, and Rupp testified the wound was a
deliberate cut.  Id.  Appellant argued on appeal the trial court erred
in allowing this testimony because it embraced an ultimate issue.  Id. 
The appellant in Hernandez also cited to Williams and Winegarner
for support.  Id.  Ultimately the Hernandez court determined Rupp=s testimony was
admissible because Williams and Winegarner were distinguishable
and according to Rule 704 of the Texas Rules of Evidence, testimony by an
expert of an opinion that embraces the ultimate issue of fact is allowed.  Id.
at 275B76.  

Finally, the First Court of Appeals issued an unreported
case with similar facts, which we find persuasive.  McKinny, 1990 WL
88582, at *1.  In McKinney, appellant was convicted of injury to a
child.  Id.  During trial, a medical doctor testified in his medical
opinion the injuries inflicted on the child were done intentionally.  Id. at
*3.  Appellant argued on appeal this was error, and the First Court of Appeals
disagreed.  Id. at *3B4.  The court held the doctor was sufficiently
qualified and under Rule 704 allowed to testify regarding an ultimate issue.  Id.
at *4.  








We find the analysis and holdings in these cases
persuasive.  Accordingly, under Tex. R. Evid. 702 and 704, we find Dr. Allen
was qualified to render his opinion on the ultimate issue of whether D.D.=s injuries were
intentionally inflicted.  Tex. R. Evid. 702, 704.  Therefore, appellant=s third issue is
overruled.  

B.      Was the
Evidence Legally Sufficient?

In appellant=s first issue, she
argues the evidence was legally insufficient to support the verdict of guilt. 
More specifically, appellant argues no evidence exists to prove appellant was
the perpetrator of the crime and no evidence exists to prove the manner and
means of death.[2]

1.       Standard
of Review

In a legal sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.
2781, 2789, 61 L. Ed. 2d. 560 (1979); Salinas v. State, 163 S.W.3d 734, 737 (Tex. Crim.
App. 2005).  The jury, as the sole judge of the credibility of the witnesses,
is free to believe or disbelieve all or part of a witness=s testimony.  Jones v. State,
984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  We do not engage in a second
evaluation of the weight and credibility of the evidence, but only ensure the
jury reached a rational decision.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).

 








2.       Analysis

A person commits capital murder if she intentionally or
knowingly causes the death of an individual under six years of age.  Tex. Penal
Code Ann. '' 19.02(b)(1), 19.03(a)(8).  The identity of the
perpetrator of an offense can be proven by direct or circumstantial evidence.  Earls
v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986).  Direct evidence of the
elements of the offense is not required.  Hooper v. State, 214 S.W.3d 9,
14 (Tex. Crim. App. 2007)  Juries are permitted
to make reasonable inferences from the evidence presented
at trial, and circumstantial evidence is as probative as
direct evidence in establishing the guilt of an actor.  Id. at 14B15. 
Circumstantial evidence alone can be sufficient to establish guilt.  Id.
at 15. 

Appellant argues the evidence is legally insufficient to
prove she was the person who caused D.D.=s injuries because
appellant was only one of several other people who had the opportunity to
injure her.  Appellant argues in her brief the jury was not entitled to find
the elements of the offense simply by rejecting appellant=s testimony she
did not hurt the baby.  Appellant argues the evidence failed to show the
injuries occurred while appellant was alone with D.D., and since Dr. Allen
testified he did not know exactly when the injuries occurred, the jury was left
to speculate.  Appellant also argues the evidence is legally insufficient to
prove the manner and means of death.  The jury was charged with four different
possible theories of death which included: striking the complainant against an
unknown object, striking the complainant with an unknown object, striking the
complainant with the defendant=s hand, or shaking the complainant with
the defendant=s hand.  Appellant argues none of these theories were
proven.








While Dr. Allen did testify he could not pinpoint exactly
when D.D. sustained her injuries, he also testified in the vast majority of
cases similar to this one, the child would be highly symptomatic within four to
six hours after the injury, with the vast majority of symptoms occurring in the
first hour.  Dr. Allen further testified symptoms such as being severely
lethargic or comatose, not responding appropriately, seizing, and perhaps
vomiting are all symptoms which would occur almost immediately from the time of
injury.  Additionally, Dr. Gonsulan testified the injuries D.D. suffered would
have caused instant loss of consciousness and the child would have been
immediately unresponsive.  While the medical doctors were unable to determine
an exact time of death, the evidence did narrow down the potential time frame
for death. Additionally, appellant herself testified that D.D. looked fine and
responded normally up until 1:15 or 2:30 Monday morning and that if Green hurt
the baby, he did so sometime between 6 p.m. and 9 p.m. Sunday evening.  This
evidence supports the jury=s decision that appellant caused the
injuries.  Despite the circumstantial nature of the evidence, the jury was
permitted to make reasonable inferences from the evidence presented at trial.  Id.
at 14B15. 
Circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor.  Id.    








The jury=s verdict that appellant caused the fatal
injuries to the child in this case is also supported by additional evidence in
the record including the following:  appellant=s failure to call
9-1-1 and her delay in getting D.D. to the emergency room, appellant=s reaction when
Davis tried to call 9-1-1, several witnesses= testimony
regarding appellant=s demeanor and behavior in the ambulance
and at the emergency room, appellant=s inconsistent
statements given to the social worker and the police, Davis=s testimony that
D.D.=s crying got on
appellant=s nerves, appellant=s past statements
to Davis threatening to drown D.D. in the bathtub if he did not pick her up,
testimony regarding a past spiral fracture to D.D.=s femur, medical
testimony that D.D. suffered from malnutrition, and testimony appellant was a
violent and untruthful person.  Green was the only other person left alone with
D.D. during the time frame in which the injuries could have occurred, and Green
testified he never got angry with D.D. and he never hurt her.  The jury, as the
sole judge of the credibility of the witnesses, was free to believe all or part
of Green=s testimony and
determine Green was not the perpetrator.  See Jones, 984 S.W.2d at 257. 
Furthermore, the jury was free to disbelieve all or part of appellant=s testimony.  See
id.

Additionally, evidence existed to prove the manner and
means of death.  The evidence at trial revealed D.D.=s cause of death
was craniocerebral trauma, which is more commonly referred to as blunt force
trauma.  Both Dr. Allen and Dr. Gonsulan testified the injuries sustained by
D.D. were consistent with shaken baby syndrome and also with severe blunt force
trauma to D.D.=s head either by hitting the child with something or
hitting the child against something.  Also, both doctors testified the injuries
sustained were consistent with child abuse.     

We have reviewed the entire record in this case.  When
viewed in the light most favorable to the verdict, we find the evidence is
sufficient to permt a rational jury to find the elements of the offense beyond
a reasonable doubt.  See Salinas, 163 S.W.3d at 737.  Accordingly,
appellant=s first issue is overruled.               

C.      Was the
Evidence Factually Sufficient?

In appellant=s second issue,
she argues the evidence was factually insufficient to prove appellant
intentionally or knowingly committed the offense.       

1.       Standard
of Review








In a
factual sufficiency review, we consider all the evidence in a neutral light.  Prible
v. State, 175 S.W.3d 724, 730B31 (Tex. Crim. App. 2005).  The
evidence may be factually insufficient in two ways.  Id. at 731.
 First, when considered by itself, evidence supporting the verdict may be
so weak the verdict is clearly wrong and manifestly unjust.  Id.  Second,
where the evidence both supports and contradicts the verdict, the contrary
evidence may be strong enough that the beyond-a-reasonable-doubt standard could
not have been met.  Id.  In conducting a factual sufficiency review, we
must employ appropriate deference so that we do not substitute our judgment for
that of the fact finder.  Jones v. State, 944 S.W.2d 642, 648 (Tex.
Crim. App. 1996).  Our analysis must consider the evidence appellant claims is
most important in allegedly undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). 

2.         Analysis

For the
State to prove appellant committed capital murder, it was required to prove she
intentionally or knowingly caused D.D.=s death.  See Tex. Penal Code
Ann. '' 19.02(b)(1),
19.03(a)(8).  Proof of a culpable mental state almost invariably depends upon
circumstantial evidence.  Montgomery, 198 S.W.3d at 87; Morales v.
State, 828 S.W.2d 261, 263 (Tex. App.CAmarillo 1992), aff=d, 853 S.W.2d 583
(Tex. Crim. App. 1993).  Intent can be inferred from the extent of the injuries
to the victim, the method used to produce the injuries, and the relative size
and strength of the parties.  Patrick v. State, 906 S.W.2d 481, 487
(Tex. Crim. App. 1995).  In a murder case, evidence of a particularly brutal or
ferocious mechanism of death, inflicted upon a helpless victim, can be
controlling upon the issue of intent or knowledge.  Id.  Additionally,
culpable mental state can be inferred from the acts, words, and conduct of the
accused.  Id.  

The
extent of D.D.=s injuries contributes to a showing of intent.  In this case, Dr. Allen
testified the type of head injuries sustained by D.D. were inconsistent with a minor
head injury, but instead, were injuries similar to those that would result from
crashing in a high speed motor vehicle accident, falling from a roof, or being
hit with a baseball bat.  Dr. Allen also testified the injuries D.D. sustained
to her body were highly consistent with child abuse and were typically caused
by high amounts of force.  Dr. Allen testified D.D.=s injuries were Aall high speed, high velocity
injuries, which were directly intended to hurt [D.D.].@  Dr. Gonsulan testified similar to
Dr. Allen.  According to Dr. Gonsulan, the head injuries suffered were caused
by blunt force trauma, and the spiral fracture on D.D.=s femur was consistent with child
abuse.  See Montgomery, 198 S.W.3d at 87 (using the severity of the
injuries sustained by the infant as evidence of appellant=s intent).








The
difference in size between appellant and D.D. also contributes to a showing of
intent.  While the record does not establish appellant=s size, it is reasonable to assume
she was much larger than her ten-month-old baby who weighed approximately
seventeen pounds.  See Sadler v. State, 364 S.W.2d 234, 237 (Tex. Crim.
App. 1963) (finding evidence of intent where male defendant, a boxer, who was
thirty years old, over six feet tall, and weighed 190 pounds, killed the female
complainant who was twenty-two years old, five feet tall, and weighed ninety to
one hundred pounds, by hitting her in the face and head with his hands and
fists).  

Furthermore,
appellant=s acts before and after the baby went to the hospital contribute to a
showing of intent.  This testimony includes:  witnesses= testimony that appellant threatened
to drown D.D., appellant=s failure to call 9-1-1, her delay in getting D.D. to the
hospital, testimony appellant was laughing and chatting with the ambulance
driver on the way to the hospital, testimony appellant was laughing and talking
on her phone in the emergency room, testimony from the medical doctor that
appellant appeared disinterested in her child, and appellant=s inconsistent statements to the
social worker and the police.  








Appellant
argues the testimony from Caballero and Larson is the most important evidence
that undermines the jury=s verdict.  Caballero, the paramedic who arrived at the
scene, and Larson, a fire department captain on the scene, both testified the
child showed no outward signs of trauma when they first observed her at
appellant=s house.  Caballero testified he did not notice anything unusual and D.D.
was responding to stimuli. Appellant argues this evidence is so  contrary to
the medical doctors= testimony regarding the severity of D.D.=s injuries the jury=s verdict is against the great weight
and preponderance of the evidence.  We disagree.  Both Caballero=s and Larson=s assessment of the child was a brief
observance of the outward physical trauma D.D. suffered.  The medical doctors= testimony primarily addressed the
internal injuries suffered by D.D. and the severity of those injuries which
ultimately killed her.  Caballero=s and Larson=s testimony is not in stark contrast
to the doctors= testimony and does not undermine the jury=s verdict.  Furthermore,
reconciliation of any conflicts in the evidence falls within the exclusive
province of the jury.  Heiselbetz v. State, 906 S.W.2d 500, 504 (Tex.
Crim. App. 1995).   

After
considering all the evidence in a neutral light, we find the contrary evidence
is not so strong that the beyond-a-reasonable-doubt standard could not have
been met, nor is the evidence supporting the verdict so weak it is clearly
wrong and manifestly unjust.  See Prible, 175 S.W.3d at 730B31.   Accordingly, appellant=s second issue is overruled.

D.        Did the Trial Court Err in
Refusing to Include the Lesser Included Offense of Injury to a Child in the
Jury Charge?

In her
third point of error, appellant argues the trial court erred in denying her
request to include the lesser included offense of injury to a child in the jury
charge.[3] 

1.         Standard of Review








In order for a trial court to determine whether it should
charge a jury on a lesser offense than the one for which the defendant is
indicted, the trial court employs a two-prong test: (1) the lesser included
offense must be included within the proof necessary to establish the offense
charged; and (2) some evidence must exist that would allow a jury to rationally
find that if the defendant is guilty, he is guilty only of the lesser offense. 
Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); Paz v.
State, 44 S.W.3d 98, 100 (Tex. App.CHouston [14th
Dist.] 2001, pet. ref=d, untimely filed).  In making this
determination, we must review all the evidence admitted at trial.  Enriquez
v. State, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000); Paz, 44 S.W.3d
at 100.  If more than a scintilla of evidence from any source raises the issue
that the defendant is guilty only of the lesser included offense, the
instruction must be submitted.  Forest v. State, 989 S.W.2d 365, 367
(Tex. Crim. App. 1999); Paz, 44 S.W.3d at 100.  Credibility of the
evidence and whether it conflicts with other evidence is not to be considered
when determining whether the jury should have been charged with a lesser
included offense.  Banda v. State, 890 S.W.2d 42, 60 (Tex. Crim. App.
1994); Paz, 44 S.W.3d at 100.  

2.       Analysis

Appellant was charged with capital murder for intentionally
or knowingly causing the death of an individual under six years of age.  See
Tex. Penal Code Ann. '' 19.02(b)(1), 19.03(a)(8).  A person
commits the offense of injury to a child if he intentionally, knowingly,
recklessly, or with criminal negligence, by act or omission, causes serious
bodily injury to a child.  Tex. Penal Code Ann. ' 22.04(a)(1)
(Vernon 2003).  Serious bodily injury is defined in the penal code as Abodily injury that
creates a substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily
member or organ.@  Tex. Penal Code ' 1.07(46) (Vernon
2003).  A person acts recklessly when Ahe is aware of but
consciously disregards a substantial and unjustifiable risk that the
circumstances exist or will occur.@  Tex. Penal Code
Ann. ' 6.03(c) (Vernon
2003).  A person acts with criminal negligence when he Aought to be aware
of a substantial and unjustifiable risk that the circumstances exist or the
result will occur.@  Id. ' 6.03(d).  








The first prong of the test is satisfied.  Injury to a
child is a lesser included offense of capital murder.  Paz, 44 S.W.3d at
101; See Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2003) (providing
the general rules for when an offense qualifies as a lesser included offense). 
However, we must also determine whether some evidence existed that would allow
a jury to rationally find that if appellant was guilty, she was guilty only of
the lesser offense.  See Paz, 44 S.W.3d at 101.  

In support of the second prong of the test, appellant
argues the evidence of her intent was primarily derived from the testimony of
Dr. Allen and Dr. Gonsulan regarding the nature of the injuries and that the
testimony of Caballero and Larson contradicted the doctors= opinions.  As
discussed above, Caballero and Larson both testified they saw no outward signs
of trauma and no indication of significant injuries when they observed D.D. at
appellant=s apartment.  Appellant argues this testimony is in
stark contrast to the doctors= testimony regarding the severity of D.D.=s injuries. 
Appellant argues a rational jury could conclude from this evidence the medical
doctors= testimony was
greatly exaggerated and, instead, Caballero=s and Larson=s testimony is
proof appellant did not intend to kill D.D. or know death would result. 
Additionally, appellant argues her failure to call 9-1-1 and delay in taking
D.D. to the hospital helped prove appellant did not understand the severity of
the injuries, which supports the inference that her actions were not intentional
or knowing but, instead, were only reckless or criminally negligent. 








We do not agree with appellant that Caballero=s and Larson=s testimony
contradicts the testimony of the medical doctors.  The testimony of Caballero
and Larson dealt with whether they observed outward physical signs of trauma on
D.D.=s body.  Neither
Caballero nor Larson were trained medical doctors who could testify to the true
severity of the injuries D.D. suffered internally.  In fact, Larson testified
while he did not observe outward signs of trauma, closed head injuries were
often hard to see.  Also, Caballero admitted this was his first baby case and
he did not feel very confident in his assessment.  Simply because Caballero and
Larson were unable to assess the true severity of the injuries does not support
a finding that the medical doctors= testimony was
greatly exaggerated and that appellant acted recklessly or with criminal
negligence.  This testimony is not evidence that appellant was aware of but
consciously disregarded a substantial and unjustifiable risk, which is required
for a reckless mens rea, nor is it evidence that appellant ought to have been
aware of a substantial and unjustifiable risk, which is required for a
criminally negligent mens rea.  See Tex. Penal Code Ann. ' 6.03(c),(d).    

Because there were no witnesses to the offense, we must
rely on the testimony of expert witnesses to inform us of the nature of D.D=s injuries.  See
Paz, 44 S.W.3d at 102.  Dr. Allen testified D.D. was a severely beaten
child and her injuries were Aall high speed, high velocity injuries,
which were directly intended to hurt [the] child.@  He testified
D.D.=s head injury was
highly inconsistent with a minor head injury and more similar to injuries
caused by crashing in a high speed motor vehicle accident or being hit with a
baseball bat.  Additionally, the retinal hemorrhages, the multiple broken
bones, and the types of fractures suffered were all indications the injuries
were intentionally inflicted.  Dr. Allen also testified whoever killed D.D.
would have immediately known she was severely injured, and a majority of the
symptoms would have occurred almost immediately from the time of injury.  Dr.
Gonsulan testified the spiral fracture D.D. suffered was a common injury in
child abuse cases, and that D.D. died from blunt force trauma to the head.  She
also testified D.D.=s injuries would have caused instant loss
of consciousness and would have been immediately unresponsive.  We believe this
evidence supports a finding of intent, and the testimony appellant relies on to
argue she was entitled to a lesser included offense charge of injury to a child
was no evidence at all.    








Additionally, throughout the entire trial, appellant=s defense was that
she never committed any acts of violence against her baby.  Appellant denied
hurting her baby in her statements to the paramedics, the doctors, the social
worker, the police officers, and in her testimony at trial.  In fact, appellant
blamed D.D.=s injuries on the daycare, the hospital, and her
boyfriend.  In Bignall v. State, the Court of Criminal Appeals concluded
A>if a defendant
either presents evidence that he committed no offense or presents no evidence,
and there is no evidence otherwise showing that he is guilty only of a
lesser-included offense, then a charge on a lesser-included offense is not
required.=@  Bignall v. State, 887 S.W.2d 21,
24 (Tex. Crim. App. 1994) (quoting Aguilar v. State, 682 S.W.2d 556, 558
(Tex. Crim. App. 1985)).  Because we find appellant=s argument above
was no evidence and because appellant=s defense at trial
was that she did not commit the acts against her baby, a charge on a
lesser-included offense is not required.  See id.  Accordingly, we find
the trial court did not err in refusing to charge the jury on the lesser
included offense of injury to a child.  Appellant=s third issue is
overruled.       

Conclusion

Having determined the judgment for punishment incorrectly
states that a jury assessed punishment, we modify the judgment to properly
reflect that the judge assessed appellant=s punishment. 
Having overruled each of appellant=s issues, we
affirm the judgment of the trial court as modified.

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Opinion filed December 13, 2007.

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

Publish C Tex. R. App. P. 47.2(b).      

 

  

    

 









[1]  It appears the mistake on the judgment was simply a
matter of someone circling the wrong word on the judgment form.





[2]  Appellant only challenges the legal sufficiency of
the evidence on these two particular elements; accordingly, we will only
address whether legally sufficient evidence supports these two particular
elements.  Under appellant=s factual
sufficiency argument discussed below, her only challenge is that the evidence
is factually insufficient to support a finding of intentional or knowing. 
Therefore, we will only address whether that particular element is supported by
factually sufficient evidence.   





[3]  During trial, appellant also requested a charge on
injury to a child by omission.  On appeal, however, appellant only argues that
injury to a child should have been submitted to the jury, so she has waived her
injury to a child by omission argument.  See Tex. R. App. P. 38.1; McIntyre
v. Wilson, 50 S.W.3d 674, 682 (Tex. App.CDallas
2001, pet. denied).  Also, the State argues appellant only preserved her
request for injury to a child by omission during trial because appellant=s primary arguments during her objection focused on
why the evidence supported injury to a child by omission.  We disagree with the
State.  To preserve an argument regarding the trial court=s failure to include a lesser included offense in the
charge, the appellant must make a request or objection before the charge goes
to the jury and be specific enough to put the trial court on notice of the
omission or error in the charge.  See Tex. Code. Crim. Proc. Ann. art.
36.15 (Vernon 2003).  Before the charge went to the jury, appellant requested
the trial court include both injury to a child and injury to a child by
omission; therefore, she sufficiently preserved error.